

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 2, 2019

Via ECF
The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Mario Amilcar Estrada Orellana*,
              19 Cr. 328 (JSR)

Dear Judge Rakoff:

      The Government respectfully submits this letter in opposition to the defendant's motion for pretrial release in this case.

      The defendant is a Guatemalan politician and former candidate for President of Guatemala. Over the course of several months prior to his arrest, the defendant offered to sell access to the highest office in Guatemala to men he believed were members of the Sinaloa Cartel, a violent, international drug-trafficking organization. In the process, the defendant (i) offered to place individuals chosen by the Sinaloa Cartel into high-ranking positions in the Guatemalan Government; (ii) agreed to allow the Sinaloa Cartel to transport large quantities of cocaine through Guatemala, in exchange for a portion of the profits from its sale in the United States and elsewhere; (iii) traveled to the United States to meet with purported members of the Sinaloa Cartel to discuss their partnership and to obtain $5 million in drug money; (iv) volunteered a clandestine method to transfer narcotics proceeds from the United States to Guatemala via a hidden room on a yacht; (v) boasted of other cartels that had offered him campaign funding; and (vi) discussed the potential assassination of his political rivals.

      In April 2019, the defendant traveled to Miami, Florida, hoping to finalize his partnership with the Sinaloa Cartel. Instead, he was arrested, and he now faces charges that carry a mandatory minimum of 10 years' imprisonment. The defendant asks the Court to accept a promise that he will not flee or endanger anyone if released pending trial—a promise secured by a wholly inadequate financial commitment. The request should be rejected. Because there are no conditions that could address the significant flight risk and danger to the community posed by the defendant, he should be detained pending trial.

## BACKGROUND

I.	**Offense Conduct**

As set forth in Indictment 19 Cr. 328 (JSR), a grand jury in this District has found probable cause that the defendant was involved in a conspiracy to import cocaine into the United States and to possess machine guns in furtherance of this conduct. The defendant was eager to sell his Government to the highest bidder, and to enter into a partnership with the Sinaloa Cartel that would involve the transport of huge amounts of cocaine through Guatemala, a country that the defendant promised to make a safe-haven for the Sinaloa Cartel if he was elected. This conduct, egregious and deadly enough standing alone, was exacerbated by the defendant's other attempt to ensure his election—his apparent solicitation of assassins to kill certain of his political rivals.

The investigation began in January 2019, when the defendant's co-defendant, Juan Pablo Gonzalez Mayorga ("Gonzalez") met with a Drug Enforcement Administration ("DEA") confidential source ("CS-1") in Guatemala. During this meeting, Gonzalez explained to CS-1 that he was an active member of a political party ("Party-1") in Guatemala and that the defendant was Party-1's candidate for president. *See* Compl. ¶ 10(a).[1] Gonzalez told CS-1 that the defendant's campaign (the "Estrada Campaign") needed funding from a drug cartel to be competitive in the upcoming election, and he asked CS-1 if he knew anyone who could be helpful. *Id.* In exchange, Gonzalez explained, the defendant would use various Government agencies to support the cartel's drug trafficking activities in Guatemala, including through influence over the appointment of several cabinet-level positions. *Id.* The next day, CS-1 met with Gonzalez and the defendant. *Id.* ¶ 10(b). At this meeting, CS-1, Gonzalez, and the defendant discussed whether CS-1 had access to any drug cartels to provide the Estrada Campaign with financing, and CS-1 informed them that he had contacts in the Sinaloa Cartel that could possibly provide funding. *Id.* In response, the defendant promised that he could provide the cartel with access to the Government of Guatemala, including through the appointment of cartel members to high-ranking positions in Guatemala to assist in their narcotics trafficking. *See id.*[2]

Eager to pursue this relationship, Gonzalez met with CS-1 and a second confidential source ("CS-2" and together with CS-1, the "CSes") on February 7, 2019. During this meeting, Gonzalez detailed for the CSes his family's history in Guatemalan politics and the defendant's chances for victory if he received cartel funding. Compl. ¶ 11. Gonzalez also raised with the CSes whether they could kill certain political rivals, and explained that the campaign would pay the CSes to carry out the murders. *Id.* The following day, the CSes met with the defendant and Gonzalez. *Id.* ¶ 12. During that meeting, CS-2 explained that he represented Ismael Mayo Zamda, the leader of the Sinaloa Cartel, and that Zambada was interested in contributing to Estrada's campaign in exchange for Estrada supporting the cartel's drug-trafficking activities in Guatemala. *Id.* The defendant explained why he needed the money—to deliver some to each of the 22 districts

---

[1] All references to "Compl." are to Complaint 19 Mag. 3705.

[2] The defendant correctly notes that these initial meetings between CS-1, Gonzalez, and the defendant were not recorded. The rest of the meetings and conversations recounted here and in the Complaint, however, were audio-recorded, video-recorded, or both.

in Guatemala—and predicted that he could win the election if the cartel provided him with 10 to 12 million dollars. *Id.* CS-2 explained to the defendant that the money would come from cocaine sales in New York, and that, in exchange, CS-2 would require Estrada to help the cartel transport cocaine through the airports in Guatemala. *Id.* Indeed, CS-2 detailed that the cartel would send approximately six cocaine-laden airplanes per month through the country, each of which would carry multiple tons of cocaine, and that CS-2 would pay the defendant the value of approximately 10 percent of the cocaine on each plane. *Id.* The defendant agreed to assist the cartel in exchange for the campaign financing. *Id.* The parties then discussed assassinating political rivals to benefit the Estrada campaign. *Id.* ¶ 12(f). Estrada provided the CSes with the names of two potential victims, and explained which one they should target first. *Id.* In so doing, Estrada explained that this target had many enemies in Guatemala and would thus be easier to target. *Id.*

The meetings continued the following week in Florida, with Gonzalez first traveling to Miami to meet with CS-2 and an undercover officer ("UC-1"). Compl. ¶ 13. There, CS-2 introduced UC-1 to Gonzalez as a hitman available for hire, and they continued to discuss the defendant's campaign's desire to assassinate certain rivals. *Id.* Gonzalez promised to provide CS-2 and UC-1 with detail on targets, and assured the purported hitman that they could provide AK-47s/ *Id.* When pressed for particular weapons, he indicated that the defendant would have their preferred weapons available. *Id.* While Gonzalez was in Miami, the defendant was meeting with CS-1 in Guatemala, where he expressed his concern to CS-1 that Gonzalez was being careless and that they could end up with criminal charges as a result of their conduct. Compl. ¶ 14.

Despite his concerns over criminal exposure, the defendant continued to meet with the CSes in Guatemala and the United States. On February 27, 2019, the defendant traveled to Miami where he met with the CSes on an undercover DEA yacht (the "Yacht"). Compl. ¶ 16. The below photograph (drawn from a video recording) depicts the defendant with the CSes, whose faces are blurred:



During the course of the meeting on the Yacht, CS-2 again explained that the Sinaloa Cartel had recently received 30 tons of cocaine in New York, and that the money to Estrada would be proceeds from the sale of that cocaine. *Id.* The defendant and CS-2 further discussed their agreement

concerning how the defendant would support the cartel if elected, and CS-2 reiterated that the cartel would send multiple cocaine-laden planes per month to New York, by way of Guatemala and Mexico, and that the defendant would receive 10 percent of the profits from sale. *Id.* The defendant boasted that he was going to win the election and that he would support the cartel after he assumed office, and asked the CSes if he could receive one or two million dollars quickly to invest in his campaign. *Id.* During the meeting, CS-2 provided the defendant with $10,000 in cash (circled in red, below), and noted that he did not want to give more money at the time because it could draw law enforcement attention:



During this meeting, the defendant also told CS-2 that he no longer wanted to proceed with the discussed assassinations—not because of any moral qualm or hesitation, but because he learned that someone else was targeting one of the potential victims and he thought it would bring the campaign unwanted issues if they proceeded. *Id.* The defendant and Gonzalez, along with other co-conspirators, continued to meet with the CSes over the ensuing weeks. During the course of one such meeting, the defendant explained that he was working with another drug trafficker in Guatemala who was supporting his candidacy, and had heard that the Jalisco Nueva Generación cartel wanted to provide him with funding. Compl. ¶ 19(b).

Finally, in addition to the conduct outlined in the Complaint, the defendant also participated in numerous additional conversations concerning the transfer of the cartel's drug money back to Guatemala, revealing the defendant's extensive network. For example, on or about March 4, 2019, the defendant discussed with CS-1 and a co-conspirator ("CC-1") how they could move the cartel's bulk currency from the United States to Guatemala. The defendant suggested they use the Yacht, as the CSes had told him the Yacht had a hidden room inside. The defendant surmised that because the Yacht would be flying an American flag, it would likely not be checked upon arrival in Guatemala. The defendant detailed on a map how the Yacht could travel—from Miami, through Cuba, to Guatemala, and explained that any risks of the Yacht being searched were mitigated because it was a luxury yacht, flying the American flag, and sailed by American citizens. Clearly, the defendant was well versed in the potential smuggling operation and attuned to the steps one would have to take to travel covertly from the United States to Guatemala. While the parties considered this possibility, the following day, CC-1 explained to the defendant and CS-

1 that CC-1 had a confederate in Miami who could help them move money and exchange U.S. dollars for Guatemalan currency. The defendant engaged in multiple such conversations.

Following his arrest, the defendant waived his *Miranda* rights in writing and participated voluntarily in an interview conducted by law enforcement. During the interview, the defendant admitted, in substance and in part, that (i) he came to Miami to meet with CS-2 to discuss campaign financing, and had met with CS-2 on two previous occasions; (ii) he was planning to accept $5 million towards his campaign from CS-2; (iii) Gonzalez and CS-1 introduced him to CS-2; (iv) he thought CS-2 may have been involved in bad things, like narcotics trafficking, and that he had once been asked by CS-1 and CS-2 about participating in the drug trade but declined; (v) CS-2 asked for control over specific positions in the Government, but that Estrada had told him that he could not appoint individuals who would support drug trafficking; and (vi) the requested money was probably coming from the Sinaloa Cartel, but he was not himself responsible for the source of the funds.

## II.     The Pending Charges

The defendant was first presented in the Southern District of Florida on April 18, 2019, and the pretrial services office in that district recommended that he be detained as a flight risk. The defendant consented to detention and was transferred to this District. On May 2, 2019, a grand jury in this District returned the Indictment, which charges the defendant in two counts with participating in conspiracies to (i) manufacture, possess with intent to distribute, and distribute, five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 812, 959, and 963, and (ii) possess machineguns and destructive devices in furtherance of this narcotics conspiracy, in violation of 18 U.S.C. § 924(o). The charges in the Indictment carry a mandatory minimum term of 10 years' imprisonment and a maximum term of life imprisonment.

## **APPLICABLE LAW**

"[P]retrial detention was the means chosen by Congress in the Bail Reform Act to protect the community from dangerous defendants." *United States v. Dono*, 275 F. App'x 35, 38 (2d Cir. 2008). "The purpose of such detention must be to regulate the defendant's conduct, *i.e.* to prevent danger to the community and ensure the defendant's presence at trial . . . ." *United States v. Lewis*, 5 F. Supp. 3d 515, 526 (S.D.N.Y. 2014). Thus, section 3142 "requires that an accused be detained pending trial where, following a hearing in accordance with § 3142(f), 'the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *United States v. English*, 629 F.3d 311, 318 (2d Cir. 2011) (quoting 18 U.S.C. § 3142(e)(1)). When assessing a defendant's risk of flight and the danger to the community that would be presented by his release, courts must consider four factors set forth in the statute: (1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence"; (2) "the weight of the evidence against the person"; (3) the "history and characteristics of the person"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

The Government bears the burden of establishing that the defendant poses a flight risk by a preponderance of the evidence, and that he poses a danger to the community by clear and convincing evidence. *See* 18 U.S.C. § 3142(f); *see also United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). However, "[s]ubsection (e) of § 3142 provides that there is a rebuttable presumption that 'no condition or combination of conditions will reasonably assure' against flight or danger where probable cause supports a finding that the person seeking bail committed certain types of offenses." *English*, 629 F.3d at 319 (quoting 18 U.S.C. § 3142(e)(3)). When the presumption established by Section 3142(e)(3) applies, the defendant "bears a limited burden of production" to "rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

"Although the government retains the burden of persuasion, a defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) (citing *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986)). "Once a defendant introduces rebuttal evidence, the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant." *Id.*

## **DISCUSSION**

### I. There is a Presumption in Favor of Detention in This Case

Count One of the Indictment gives rise to a presumption under Section 3142(e) that the defendant should be detained pending trial on the bases of risk of flight and danger to the community. "'[A]n indictment returned by a duly constituted grand jury conclusively establishes the existence of probable cause for the purpose of triggering the rebuttable presumptions set forth in § 3142(e).'" *United States v. Hoey*, No. 11 Cr. 337 (PKC), 2014 WL 572525, at *1 (S.D.N.Y. Feb. 13, 2014) (quoting *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011)). Count One charges a violation of the Controlled Substances Act with a maximum penalty of life imprisonment, which triggers the presumption. *See* 18 U.S.C. § 3142(e)(3)(A).

### II. Section 3142(g) Counsels In Favor of Pretrial Detention

Even in the absence of the statutory presumption, the relevant factors identified in Section 3142(g) all support continued pretrial detention. The defendant is charged with serious crimes arising out of an egregious and extended course of conduct. The penalties at issue are appropriately severe. The evidence against the defendant is strong. He lacks ties to the United States and maintains strong connections abroad—connections he has already offered for sale to violent international drug cartels. Accordingly, based on all of these considerations, the defendant should be detained pending trial.

#### A. The Nature and Circumstances of the Offenses

The nature and circumstances of the charged offenses demonstrate that the defendant poses a danger to the community and a significant flight risk. The defendant's conduct

could hardly be more serious: He betrayed the Guatemalan public's trust, offering his country's highest office for sale—to purported representatives of the Sinaloa Cartel—in exchange for campaign funding and portions of future cocaine sales in the United States. He also conspired to assassinate certain of his rivals, until he decided targeted murder was too dangerous and no longer politically expedient. The defendant's co-conspirator bragged of the defendant's access to AK-47s and other firearms, and the defendant cavalierly discussed the targets of his murderous plans. All of this was captured on audio and video recordings made over the course of months by multiple confidential sources and undercover police officers.

In light of the gravity of this conduct, the serious charges in the Indictment carry appropriately heavy penalties. Count One carries a mandatory minimum term of 10 years' imprisonment and a maximum term of life. *See* 21 U.S.C. § 960(b)(1)(B). Count Two carries a maximum term of life. *See* 18 U.S.C. § 924(o). Therefore, as a result of these charges, the defendant faces a mandatory minimum term of 10 years' imprisonment and a maximum term of life. It is an understatement to observe under these circumstances that "[t]he lengthy jail sentence that could be imposed for the charged crimes provides an incentive to flee." *United States v. Liebowitz*, 669 F. App'x 603, 605 (2d Cir. 2016); *see also United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) ("[A] district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possess a strong motive to flee."). Thus, the nature and circumstances of the charged offenses weigh in favor of pretrial detention on the bases of danger to the community and flight risk.

### B. The Strength of the Case

The strength of the evidence against the defendant also counsels in favor of pretrial detention. If the case proceeds to trial, the Government's proof will largely consist of the words of the defendant and his co-conspirators recorded on audio and video. The defendant discussed in explicit terms both his eagerness to sell access to the Guatemalan Government and his desire to participate in a massive cocaine partnership with the Sinaloa Cartel, and boasted of his other connections to drug traffickers and other cartels. Further, the defendant discussed plans to assassinate certain of his rivals, and his co-defendant made similar statements in recorded conversations. The defendant was also captured on video recording, such as the video on the Yacht when he met in Miami with the CSes to further their partnership. Despite the defendant's efforts to minimize his participation in the offense conduct, his post-arrest admissions only strengthen the Government's case. In short, the evidence against the defendant is very strong, and it weighs in favor of continued pretrial detention in this case.

### C. The History and Characteristics of the Defendant

The history and characteristics of the defendant, including his extensive foreign connections, increase the risk of flight created by the charges, the seriousness of the criminal conduct alleged, and the strength of the Government's case.

The defendant is a Guatemalan citizen with extensive personal and political connections in Guatemala and virtually no apparent connections to the United States. *See United States v. Sabhnani*, 493 F.3d 63, 76-77 (2d Cir. 2007) (finding Government's "argument for

The Honorable Jed S. Rakoff  
July 2, 2019

detention" to be "particularly compelling" because "flight would impose no insurmountable personal or professional hardship" on the defendant and he had, "not surprisingly, maintained strong family ties" abroad); *United States v. Reza Zarrab*, 15 Cr. 867 (RMB), Dkt. No. 41 (S.D.N.Y. 2016) (denying bail to defendant charged with export violations based on, among other things, defendant's lack of ties to the United States, significant wealth and resources, and extensive international travel). The defendant's submission focuses, in part, on his status in Guatemala and his alleged career in business and public service. This does nothing, of course, to blunt against what is uncontroverted—that the defendant has extensive connections in Guatemala and elsewhere, and that the investigation revealed his determined, months' long efforts to sell his connections for funding from a drug cartel. Further, the defendant proposes to sign a bond with a personal surety of five million dollars—either an entirely illusory promise, or one evidencing that the defendant has extensive wealth.[3] In short, the defendant's history and characteristics, revealed by his own words and his status in Guatemala, counsel in favor of pretrial detention.

### D. The Danger Posed by the Defendant

The danger posed by the defendant also weighs in favor of pretrial detention. "[I]t is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger'" under the Bail Reform Act. *United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985); *see also United States v. Ambrosio*, No. 94 Cr. 674 (DC), 1995 WL 138605, at *2 (S.D.N.Y. Mar. 30, 1995) ("[The defendant] is charged with masterminding an international drug ring involving the importation and distribution of large amounts of narcotics, which raises a strong presumption of dangerousness."). The defendant's drug-trafficking activities were particularly dangerous because of the quantities of narcotics discussed and his own extensive connections in the Guatemalan government. If bailed, the defendant would pose a greater danger not only in the United States but also in Guatemala. *See United States v. Choudhry*, 941 F. Supp. 2d 347, 358 (E.D.N.Y. 2013) ("Although 18 U.S.C. § 3142 does not define the term community, courts considering the scope of this term have concluded that it may encompass communities outside the United States at risk of danger from a particular defendant." (citations omitted)). The defendant also discussed the possible murder of his political rivals, and his co-defendant boasted of easy access to firearms. For all of these reasons, the danger posed by the defendant is yet another consideration that supports the denial of his application for bail.

### III. There Are No Bail Conditions That Would Adequately Protect the Public and Ensure the Defendant's Appearance

In light of the foregoing, there are no bail conditions that could sufficiently mitigate the danger and flight risk posed by the defendant.

As to danger, pretrial release in this case is entirely at odds with the need to protect the public. *See, e.g.*, *Sabhnani*, 493 F.3d at 77 (describing "serious reservations about the adequacy of home confinement as a substitute for detention in cases involving violent crime"); *United States*

---

[3] While the Government's investigation into the defendant's financial status continues, public reporting indicates that he lives on a large property and owns a helicopter. *See, e.g.*, https://elperiodico.com.gt/nacion/2019/04/22/el-poder-alrededor-de-mario-estrada/

*v. Mercedes*, 254 F.3d 433, 436-37 (2d Cir. 2001) ("We have expressly held in several cases that a bail package that might 'reasonably assure the appearance of [the defendant] at trial, will not reasonably assure the safety of the community.'" (quoting *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991)); *United States v. Ferranti*, 66 F.3d 540, 543 (2d Cir. 1995) ("The $1,000,000 bond would have deterred flight, not danger."); *Hoey*, 2014 WL 572525, at *3 ("Strict pretrial supervision and electronic monitoring of [defendant] would provide little protection against future obstructive conduct."). The defendant worked with others to negotiate with the Sinaloa Cartel to traffic massive quantities of cocaine and millions of dollars of United States currency. While the CSes were only posing as cartel representatives, the defendant also boasted of separate connections to other violent cartels. If released, the defendant could more easily access this network to engage in additional dangerous criminal conduct, including efforts to intimidate witnesses and their relatives and associates abroad.[4] Further, while the defendant claims in his motion that he has no criminal record and was a law abiding citizen, it was the defendant himself who boasted to the CSes that he was in contact with other cartels and drug dealers who wanted to support his campaign. The defendant further claims in his motion that he "is not a drug trafficker" and has no contacts in the United States "that would suggest in any way that would suggest he is a danger to the community." Def. Mot. at 6. The defendant's claim that he is "not a drug trafficker" is belied by weeks of recorded conversations in which he acted as one on an international scale, discussed his relationship to other international drug traffickers, and revealed his experience and sophistication by detailing the network through which he would launder drug proceeds in Guatemala. Thus, because there are no conditions that could adequately ensure the safety of the community, pretrial detention is appropriate.

The defendant also presents an unacceptable risk of flight that cannot be addressed through bail conditions, due to the serious nature of the charged conduct, the weight of the evidence against him, and his personal characteristics. "A defendant facing a significant term of incarceration might well prefer to lose his financial assets rather than his freedom." *Sabhnani*, 493 F.3d at 77. "Further, defendants might easily persuade some friend or family member to lend them the money necessary to finance flight from the United States." *Id.* This defendant has deep political connections in Guatemala. The defendant now points to the fact that his flight would put a friend and the friend's family out of their home—ignoring, perhaps, that he was willing to sell access to his entire country to a violent narcotics cartel. Further, the defendant demonstrated throughout the investigation both access to a broad network of individuals and his own ingenuity regarding how to most effectively break the law. For example, as detailed above, the defendant explained to the CSes his plan for how they could move their narcotics proceeds to him in Guatemala, explaining that they should use the Yacht because it had a hidden room and could fly an American flag to avoid detection by authorities. Clearly, the defendant is a sophisticated man who was willing to accept millions of dollars in drug money from the Sinaloa Cartel, in exchange for *carte blanche* access to the country he was attempting to lead. He cannot now be trusted to abide by any set of conditions allowing for pretrial release.

---

[4] The investigation remains ongoing, and certain of the defendant's co-conspirators remain at large in Guatemala. In addition, certain of the defendant's co-conspirators were located in the United States at various times during the investigation, and appear to have connections in this country.

## IV. Conclusion

In sum, there is a presumption in favor of detention, and there are no conditions that could adequately protect the public and guarantee the defendant's appearance at trial. Therefore, pretrial detention is appropriate.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:   /s/
Matthew J. Laroche
Jason A. Richman
Assistant United States Attorneys
(212) 637-2420 / 2589

Enclosure

Cc:   Defense Counsel
     (Via ECF)