J7HVOREC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4           v.                          19 CR 328 (JSR)

5  MARIO AMILCAR ESTRADA
   ORELLANA,

6
              Defendant.              BAIL APPLICATION

7  ------------------------------x

8
                                      New York, N.Y.
9                                     July 17, 2019
                                      3:10 p.m.
10

11 Before:

12                   HON. JED S. RAKOFF,

13                                    District Judge

14
                         APPEARANCES
15

16 GEOFFREY S. BERMAN,
        United States Attorney for the
17      Southern District of New York
   JASON A. RICHMAN
18      Assistant United States Attorney

19 ROBERT A. FEITEL
        Attorney for Defendant

20

21 ALSO PRESENT:   ERIKA de los RIOS, Interpreter (Spanish)
                   SELMA MARKS, Interpreter (Spanish)
22                 MARLON OVALLES, Pretrial Services
                   ANDRES SUAREZ, Paralegal

23

24

25

J7HVOREC

```
1              (Case called)

2              MR. RICHMAN:  Your Honor, good afternoon.

3              Jason Richman, for the government.

4              With me at counsel table is Marlon Ovalles from the

5    United States Pretrial Services Office.

6              THE COURT:  Good afternoon.

7              MR. FEITEL:  Good morning, your Honor.

8              Robert Feitel, for --

9              THE COURT:  I don't think it's morning, but --

10             MR. FEITEL:  I apologize.  It's been a long day.  I

11   should say good evening.

12             Good afternoon.  Robert Feitel, for Mr. Mario Estrada.

13   The defendant is present.  I believe he can understand the

14   proceedings via the translation and the interpreter in the

15   courtroom.

16             And also with me is my full-time paralegal, Mr. Andres

17   Suarez.  The government has no objection to him being at

18   counsel table.

19             THE COURT:  Very good.  Please be seated.

20             So we're here on the motion for pretrial release.

21             Before we hear argument, there was one allegation that

22   I thought might bear on this determination, which was the

23   defendant attempted to have his rivals assassinated.  That was

24   not part of the charge itself.  So I ask the government for

25   what evidence there was of that.
```

J7HVOREC

1          MR. RICHMAN:  Thank you, Judge.

2          Yes, your Honor.  We have two transcripts marked as

3    Government Exhibit 1 and Government Exhibit 2.  Government

4    Exhibit 1 is a snippet of a February 8th, 2019 conversation;

5    Government Exhibit 2 is a snippet from February 27th, 2019.

6    These are the two conversations.  And we have shared them with

7    defense counsel and understand defense counsel agrees with the

8    transcription and translations.  These are the two central

9    conversations involving this defendant and the assassination

10   plot.

11         THE COURT:  All right.

12         MR. RICHMAN:  Defense counsel, I understand, will

13   speak to and I'll front for the Court now, there were other

14   conversations with the codefendant, with Mr. Gonzalez, which

15   were more in-depth.  And I think defense counsel, like I said,

16   wants to address those.  And I'm happy to pass these two

17   transcripts up.

18         THE COURT:  Please.

19         MR. RICHMAN:  Thank you, your Honor.

20         THE COURT:  All right.  So, let's see, this is a --

21   I'm looking at Government Exhibit 1, which is a conversation

22   between Mr. Gonzalez and a cooperating or informing person here

23   designated as CS2.

24         (Pause)

25         THE COURT:  The third party to the conversation is

J7HVOREC

1   Mario Estrada.

2           And the CS2 says:  There's one thing that is

3   important, Señor Estrada.  Are there any candidates that are

4   bothering you?

5           Mr. Estrada says:  That's exactly what I was going to

6   tell you as well.

7           CS2 says:  It's $15 million for you to win, right?

8   What are we going to do with them?  Are we going to need to get

9   them out of the way?  The jobs were very well done, right?

10          Mr. Estrada says:  Listen, I'm going to tell you one

11  thing.

12          And CS2 says:  If tomorrow -- I'm going to tell you

13  one thing.  Tomorrow a candidate is going to go out for a

14  stupid thing for other problems that I don't know about and

15  starts messing with you with that thing, they are going to have

16  a problem.

17          Mr. Estrada says:  Yes, yes.

18          Then Mr. Estrada says:  We need to go for a friend of

19  Thelma.

20          CS2:  Who?

21          Mario Estrada says:  Thelma.  Thelma.

22          CS2 says:  Okay.

23          Mario Estrada says:  She is the only one.

24          Mr. Gonzalez says:  So we can talk about things as

25  they are, yes?  Thelma is a problem.

J7HVOREC

1        And skipping ahead a little bit, CS2 then says:  We

2    have no problem.  We can vanish this lady, Thelma.

3        Mr. Estrada says:  Yes, well, the lady I can win

4    against, I know I can win.

5        CS2 says:  But it's a risk, right?

6        Mr. Estrada says:  The issue that she's meeting with

7    everyone.

8        CS1 says:  She's organizing everything.

9        Mr. Estrada says:  She's messing with everyone.

10       CS1 says:  In fact, all these things that are

11   happening to everyone are because of her.

12       Mr. Estrada says:  Yes, because she has two attorneys

13   who are dumb and obey her.

14       And then there's further conversations.

15       CS2 says:  No, it's not going to be like that.  The

16   strategy is not like that.  How much time do we have before we

17   can hit that bitch?

18       Mr. Estrada says:  Now!

19       Mr. Gonzalez says:  Because right now would be ideal.

20       CS2 says:  All right.  That's fine.  Her and I need

21   the name of those two bastards right away so I can start

22   looking.

23       And then there's exchange of names.

24       So that's the first exhibit.

25       The second exhibit, CS2 says:  When Juan Pablo came

J7HVOREC

that time when we spoke when I was in Guatemala, we spoke about

fucking some people up, right?  Those candidates, Thelma, the

candidate, fuck up those *huecos*, the two prosecutors, and

*galihos*.  I have the people ready over here.  I'm paying for a

hotel, I'm paying for expenses.  You're telling me Mario is to

decide that.  Are we going to continue with that?  What are we

going to do with that?

          Mr. Estrada says:  No, not anymore.  Listen up.  They

are going to fuck up Thelma any minute.  She's not going to be

able to participate.  I'm going to show it to you, the notice

here also, and give her a participation.

          All right.  There's some more, but let me ask the

government, so what is your interpretation of those

conversations?

          MR. RICHMAN:  Sure, your Honor.  Thank you.

          So our interpretation of these two conversations and

the conversations with the codefendant were that the

codefendant proposed to the sources who were posing as

representatives and associates of the Sinaloa Cartel, that they

contract to assassinate -- the reference to Thelma, we believe,

is the Thelma Aldana, who was a candidate for the presidential

election in Guatemala.

          On the February 8th conversation, your Honor, that's

when Ms. Aldana's name is provided.  There was a previous

conversation on February 7th with Mr. Gonzalez, the

J7HVOREC

codefendant, in which this was discussed and in which they also

discussed in more detail what Mr. Gonzalez and, per his

representation, Mr. Estrada wanted to do.

And the government doesn't quarrel with the

interpretation of the February 27th meeting, that at that point

Mr. Estrada said to the Sinaloa Cartel representative, No more.

I don't think we need to do this anymore.  The language used is

it would follow you around, it would be bad, and we don't have

to do it.  And that's actually corroborated by the fact that --

and I don't want to get too deep into the geopolitical waters,

but my understanding from public source reporting is that

Ms. Aldana has actually denied participation in the election,

and she was not on the ballot for the first election which was

in June.

So that comports with what he is saying in terms of we

don't need to go forward, and that is our interpretation, that

on February 8th, raring to go, ready for Ms. Aldana.  And the

two names, your Honor, the two male names, I understand, are

two attorneys that worked with or for her.  And by February

27th, the defendant had decided, You know what?  I've changed

my mind.  We don't need to do that.

THE COURT:  All right.  So that's very helpful.

So now let me hear not just on that issue, but on all

issues that defense counsel wishes to raise from defense

counsel.

J7HVOREC

1          MR. FEITEL:  Good afternoon, your Honor.

2          I'd like to start by trying to provide some

3  explanation for the excerpts of the transcripts that have been

4  provided to your Honor.

5          My analysis is that, in total, there were about 12

6  meetings between the various codefendants and the undercovers.

7  The materials provided to your Honor in support of the claim

8  about the assassinations, I think, comprise fairly less than

9  two minutes of conversation; although, on their face, I think

10  they are problematic from the point of view of the defendants.

11  I want to try to provide context for them.

12          The day before the first meeting, which is the first

13  tape that your Honor has, which is February 8th, there's a

14  meeting on February 7th between the codefendant and the

15  undercovers.  And I've spoken to Mr. Richman about this.

16          I have a DEA report that was provided to me.  He ask

17  that I not make them part of the public record, but instead I

18  read from the relevant portion because he'd like to protect the

19  continuity in this proceeding investigation.

20          But on February 7th, when it's just Mr. Juan Pablo

21  Gonzalez, the codefendant, alone with one of the undercovers,

22  the report says:  When CS1 asked Gonzalez how else the cartel

23  could help the campaign, Gonzalez asked if CS1's cartel could

24  assassinate several persons who could become a problem for

25  their campaign in the near future.  And then Mr. Gonzalez

1   identified some targets.  So the initial idea of this doesn't

2   come from Mr. Estrada, it comes from Mr. Gonzalez.

3          I've read carefully and I've also listened to the tape

4   of the February 8th conversation.  And I think there's sort of

5   a disconnect when people are speaking to each other in this

6   conversation.

7          On page 4 of the transcript of the February 8th

8   meeting, the undercover identified as CS2 says:  Then we have

9   no problem.  We can vanish this lady, Thelma.

10          And Mr. Estrada's response is:  Yes, well, of the lady

11   I can win against.  I know I can win.

12          What I believe that Mr. Estrada is talking about is

13   that he can prevail against her or, as later becomes clear, she

14   is not going to be a candidate for the job.  And I know that on

15   page 5 there's the part your Honor read where my client says

16   "now" in response to when we can hit that person.  I've

17   listened to the phone call, I've listened to the tape of it,

18   your Honor.  It's people talking all over each other.  It says

19   absolutely what Mr. Richman's transcript says, there's no doubt

20   about it.  But in context it's not entirely clear that it's

21   responsive to anything like that.

22          And the same thing happens again.  Mr. Gonzalez seems

23   to be the person moving on about the idea of killing these

24   people.  There's a conversation that's memorialized in the DEA

25   report of a meeting on February 14th with Mr. Gonzalez and the

1    informants.  In that meeting, Mr. Gonzalez was asked about his

2    timeline for the assassinations, to which Mr. Gonzalez advised

3    25 days, and added that the assassinations needed to be done

4    quickly as to not raise too much suspicion.

5         Mr. Gonzalez goes on to say that he would be providing

6    the necessary equipment to perform the assassinations, which he

7    replied, Yes, I can get you AK-47s; they are easy to get.  And

8    Mr. Gonzalez later says he can not only get the AK-47 automatic

9    weapons, he can get some pistols and provide a hotel room and

10   false identification.

11        The next conversation that the government focused on

12   is the one that takes place on a yacht.  And it's designated

13   here as Government's Exhibit 2.

14        I have a report that was prepared, and I spoke to

15   Mr. Richman about it.  It's a report of the exact same day's

16   meeting.  And in this report it says:  CS1 then inquires -- and

17   it's a reference to Mr. Estrada -- about the killings that

18   they, CS1, CS2, Estrada, and Gonzalez, had spoken about in

19   previous meeting.  And further, that his/her people have begun

20   their homework.

21        Mr. Estrada replied that that was Gonzalez's idea;

22   that that stuff will follow you forever, bad karma; and the CS

23   then no longer discussed the subject.  That's in a report that

24   I have; it's not part of the materials provided to your Honor.

25        So I said to Mr. Richman, Do you know if this

J7HVOREC

1    conversation took place before or after the snippet that

2    constitutes -- it's designated N8.  So I don't know if this

3    takes place before that or after that.

4          But what happens in these undercover cases is these

5    undercovers are fabulously well-prepared.  These people are the

6    most Machiavellian actors that you can possibly imagine.  And

7    if this conversation takes place first, what happens thereafter

8    in the government's recording, N8, is they keep going back to

9    the issue; that is, Mr. Estrada says, I don't want to do it.

10   That was Gonzalez's idea.  And they keep coming back, Well,

11   what do you say?  You're the one who has to make the decision.

12         And when your Honor reviewed the version of N8, and

13   was reading from it out loud, I don't know if your Honor got to

14   the page that's designated page 3.  Mr. Estrada does say, as

15   they are asking him about this, the final comment is:  I

16   personally think that it won't be worth it right now.  It's

17   better not to stir things up, because right now you don't know

18   why you will stir things up for, and you're going to get

19   involved in -- and then there's some expletives, and it says:

20   It's not worth it.

21         I think that, on balance, this issue was raised, I

22   think it would be hard to say -- I try not to argue contrary to

23   what the actual facts look like.  I think these issues were

24   raised -- I think my client made it pretty clear that this was

25   not something he had originated, not something that he wanted

1    to do, and not something that he was in favor of doing.

2            It's always easy to compare how terrible it could be

3    for your client under other circumstances.  But my client's not

4    the one talking about the guns, he's not talking about

5    providing pistols or helping the people do it.

6            During the course of this conspiracy that's charged,

7    there is a lot of discord among Mr. Juan Pablo Gonzalez and

8    Mr. Estrada.  It's behind the scenes; it manifests itself in

9    some of these conversations.

10           So I do think that, on balance, my client negated any

11   effort by anyone to commit this violence.  And if my timing

12   sequence is correct, even if he says, Look, that's not my

13   thing, the government keeps coming back at him.

14           So with that in mind, I do not -- if your Honor wanted

15   to hear briefly about the conditions of release and how we

16   think this plays out or if your Honor wants to hear back from

17   the government, I'll be --

18           THE COURT:  All right.  Let's quickly hear from the

19   government just to this point, and then we'll turn to the

20   conditions of release.

21           MR. RICHMAN:  Thank you, your Honor.

22           I don't quarrel with much of what defense counsel

23   said.  I think we embrace most of those facts.  And what those

24   facts boil down to for the government are that the defendant

25   and his codefendant engaged in at some point certain

J7HVOREC

conversations with confidential sources about the assassination
of rivals.  This is certainly not the heart of the case; it's
also not the heart of why we submit detention is appropriate
here.

        But, for example, in N8 and Government Exhibit 2, the
defendant's response to CS2 saying:  Those candidates, Thelma,
is, No, not anymore.  It's not, No, oh, my God, this is
horrible.  I would never do such a thing.  That was my
codefendant; that was Mr. Gonzalez.  I don't know what you're
talking about.  Please stop.

        In the first conversation, when it was brought up, the
defendant again was not like, Hey, this is horrible.  I'm
running for president.  What are we talking about?  I'm a
presidential candidate.  I can't be killing candidates.

        He was discussing it.  Even if he wasn't -- and the
government, again, doesn't quarrel with the idea that he didn't
come up with it, we also don't quarrel --

        THE COURT:  So what about one of the strongest
indications of your position is the place on page 5 of
Government Exhibit 1 where CS2 says:  No, it's not going to be
like that.  The strategy is not like that.  How much time do
you think we have before we can hit that bitch?

        And Mr. Estrada says:  Now.

        And then Mr. Gonzalez says:  Because right now would
be ideal.

J7HVOREC

1          Now, defense counsel says that Mr. Estrada's comment

2     "now" is not with reference to the suggestion that they hit

3     that bitch, which I think can be fairly interpreted as a

4     suggestion that they kill Thelma; but, rather, is just

5     responsive to other conversations that are going on around the

6     same time.

7          But I wonder if that's a fair interpretation, because

8     Mr. Gonzalez follows up Mr. Estrada's comment of "now" with the

9     statement, Because right now would be ideal.

10          So at least Mr. Gonzalez seems to understand that

11     Mr. Estrada is saying that something has to be done right now.

12     And it looks like the only thing that's being proposed is to

13     "hit that bitch."  But I don't know if you wanted to comment on

14     that or not.

15          MR. RICHMAN:  Your Honor, I certainly agree with that

16     interpretation.  And I think, even continuing on in the

17     conversation, it makes sense; because then the CS's next

18     comment is, Well, that's fine.  We need the names of those two

19     bastards right away so I can start looking, which would be a

20     natural response to someone saying they want something done

21     now.  And importantly, then the defendant himself starts to

22     provide -- and does provide -- the two names of the other two

23     targets.  I think that your Honor's reading is absolutely fair.

24          THE COURT:  All right.  Let's go back to defense

25     counsel.  And now I want to hear -- obviously I've read your

J7HVOREC

1    papers, but let me hear anything you wanted to say about your

2    bail application.

3              MR. FEITEL:  Thank you, your Honor.

4              I will try to be brief; although I'm sure your Honor

5    has experienced when lawyers say that, they ramble on all day

6    long.

7              THE COURT:  This is what hourly billing is all about.

8              MR. FEITEL:  Mr. Estrada, I think, has a profile

9    that's different from a lot of the people that appear in cases

10   like this.  I am not at all trying to minimize the significance

11   of this case.  That would be a fool's errand, and I fear your

12   Honor would stop listening to me.

13             These are serious charges against him.  I think there

14   are some complications, particularly with respect to the gun

15   charge about him, because I don't think he's involved in any of

16   that.  And there are some limits to the scope of conspiratorial

17   liability, even though prosecutors never say that there aren't.

18   And I do think that Mr. Estrada has a history of public

19   service.  He has no prior involvement in the criminal law.

20             Yes, he committed some mistakes; he committed some

21   serious errors.  But there will, I think, ultimately be some

22   consequences to them.  But the question is whether or not this

23   Court can fashion conditions that will assure his return and

24   will provide for the safety of the community.

25             As to his return, I believe that we have provided --

J7HVOREC

we don't have a Jerry Epstein situation, where my client can
offer to hire private security guards to watch him 24 hours a
day.  I've done the best that I can.  I found a place for him
to live with someone who's willing to come to court and say
that he'll be his custodian.  I found a property with a serious
value, I think it's $500,000 in unencumbered value.
Mr. Estrada would also sign a plea of promise to pay a $5
million fine if he were to flee.  He's willing to wear a GPS;
he's willing to stay at home, limit his geography and his
movements.

          So the government has his passport.  So I think it's a
fair question to ask, How could he flee?  Where would he go?
And more importantly, I think that most people act in their
self-interest.  Not always.  People do things that are contrary
to self-interest, which is why we have a criminal justice
system obviously in this country.

          But if Mr. Estrada was to be able to somehow flee,
that is, cut off his GPS bracelet, find a way to get out of
this country, even though he has no passport, you'd have to
ask, where would he go?  The government says he has lots of
contacts in Guatemala.  Let's just assume that that's true.
There is an extradition treaty.  I have clients who are
Guatemala nationals who have been extradited to the United
States.  I've been to the extradition prisons in Guatemala.

          How would that further Mr. Estrada's interests?  It

J7HVOREC

1   would make his situation enormously worse.  And I think that

2   given the guaranties that we try to put into place, there's

3   really virtually no chance.

4            I've also agreed on his behalf that he won't have

5   access to a computer, to a phone, to a tablet, or other

6   electronic information to avoid there being any sense that he

7   would have the ability to leave.  I have agreed that if I need

8   to meet him, I'll come to New York.  I was born in this city.

9   Many years ago.  I'll come back home, I'll see my family, and

10  I'll visit with Mr. Estrada and prepare for the trial or the

11  resolution of this case.

12           So I think as to the kind of guaranties, we, I think,

13  have a significant package in place to guarantee his return;

14  and I think his motivation to flee is very, very minimal.

15           The law doesn't require that we can guarantee to 100

16  percent that he won't flee; that would be impossible for me to

17  ever convince anybody.  I wouldn't even know how to say that,

18  because you never can tell what someone else is going to do.

19           If I thought that Mr. Estrada was the kind of devious

20  person who would flee after I got him bond, thus ending my

21  ability to ever speak to any other prosecutor in the Southern

22  District of New York, no one would ever have anything to talk

23  to me about ever again.  They might, but it might not be a

24  pleasant conversation.

25           I wouldn't have suggested this.  I just think given

J7HVOREC

1    his nature and his history, he's the father of four children,

2    he did live a life of public service, I think it enormously

3    unlikely that he will flee.  I don't think that he will flee,

4    and I don't think the government has sufficiently satisfied its

5    burden.

6         With respect to the issue of dangerousness, let's just

7    assume that there are these -- these conversations exist.  I've

8    tried to proffer what I think is the response to them.  The

9    appropriate response was that he didn't want anything to do

10   with this.

11        But I think the question is does he provide or present

12   a danger to the community.  I'm not sure which community the

13   government wants to talk about, because there is the community

14   here in the United States, and there is also the community back

15   in Guatemala.

16        As to the United States, the government's position is

17   my client doesn't know anybody here.  And I'm not giving him

18   the opportunity to get on the phone and call anyone, to have

19   anyone come and meet him, if your Honor would accept the

20   conditions of confinement.  So it's hard to see how he could

21   reasonably be able to find a way to become a danger to the

22   United States.

23        And in that regard, the conduct that he's alleged to

24   have committed that was dangerous was in Guatemala, not here in

25   the United States.  The converse is that if the danger is in

J7HVOREC

Guatemala, then there is no danger to the community here in the
United States, which is where he's going to be living at the
time while this case is pending along.

　　　　So I don't ask of this lightly.  I don't minimize the
charges against my client.  I don't minimize the government's
evidence against him either.  That would be foolhardy.

　　　　But I just think that in this case there is reason to
trust Mr. Estrada; I think there's reason to believe that the
conditions we've offered are sufficient to reasonably assure
his appearance to return to court, and that he won't be a
danger to the community.

　　　　I'd be glad to try and respond to any other questions
your Honor has.  That's just, sort of, a brief summary of how
this plays out in my mind for my client.

　　　　THE COURT:  All right.  Thank you.  That's very
helpful.  Let me hear from the government.

　　　　MR. RICHMAN:  Thank you, Judge.

　　　　Your Honor, at the outset, I would just briefly note
that pretrial recommends detention, both as to flight risk and
as to dangerousness.

　　　　THE INTERPRETER:  Excuse me.  Can you repeat that?

　　　　MR. RICHMAN:  Sure.

　　　　At the outset, your Honor, I would briefly note that
pretrial recommends detention, both as a flight risk and as to
dangerousness.

J7HVOREC

1          Judge, I think what this comes down to is the

2    defendant is asking you to trust him, as any defendant who's on

3    pretrial release does.  And he's asking you to trust that he

4    will return to work to face very serious charges, return to

5    court to face charges that have a ten-year mandatory minimum in

6    which -- and I know how the Court feels about the guidelines,

7    but in which the defendant's guidelines range, if convicted,

8    will be life; in which the defendant faces a very strong case,

9    as recounted in the complaint; and in which the defendant is in

10   a community in which he has very limited ties.

11          THE COURT:  So I assume that he has a strong motive to

12   flee.  The question is whether there are conditions sufficient

13   to reasonably prevent that.

14          MR. RICHMAN:  Agreed, your Honor.  I'm glad the Court

15   acknowledges the motive to flee.

16          The government submits that there are not conditions

17   in this case, certainly not this package proposed.

18          And I think the heart of it, Judge, is this is a

19   defendant who was in this conduct willing to sell out his

20   entire country.  That is what this defendant was trying to do.

21   He was negotiating with individuals whom he believed were

22   representatives of one of the largest international drug

23   cartels in the world.  He wanted to negotiate with them for

24   payments to his campaign, in exchange for *carte blanche* access

25   to his country.

J7HVOREC

1          And now the defendant is saying, Judge, you can trust

2     me.  I'm going to stay here in this country I don't

3     really know, and I'm going to face these very serious charges

4     in your Honor's court.  And at its most basic, the defendant's

5     conduct belies any notion that he can be trusted to do that.

6          In addition, your Honor, the defendant along the way

7     evidenced that he does have a criminal mindset, and evidenced

8     that he is someone who will take extreme measures to evade law

9     enforcement and also to further his own ends.  And what I mean

10    by that, in addition to, again, the heart of the conduct, which

11    was egregious, the defendant also engaged in conversations in

12    which he discussed the laundering of bulk cash proceeds,

13    cocaine proceeds, from New York and elsewhere in the United

14    States, to Guatemala.  And this is the money that the defendant

15    wanted to fund his campaign.

16          And in doing so, in one conversation, the defendant

17    actually says to the CSs, Why don't we use this yacht that

18    we're meeting on right now, because you told me there's a

19    secret room in the yacht, and we can hide bulk cash in this

20    room.  It will be flying an American flag.  You can get down

21    into the Caribbean, you can get down to Guatemala, and we can

22    move the cash that way.

23          The defendant also engaged -- and so did his

24    codefendant -- with other individuals, some of whom are still

25    under investigation, about laundering money, again, bulk

J7HVOREC

1    cocaine and narcotics proceeds, from the United States down to

2    Guatemala.  He clearly had a criminal mindset throughout the

3    investigation, and he's not someone who can be trusted to be

4    out pending trial in this case.

5              THE COURT:  All right.

6              MR. RICHMAN:  Thank you, Judge.

7              THE COURT:  Let me hear in rebuttal anything further

8    the defense counsel wants to raise.

9              MR. FEITEL:  Thank you.

10             Your Honor, I've heard your Honor's comment that you

11   think he has motive to flee.  I'm not going to quarrel with

12   your Honor's conclusion, although I think otherwise.

13             So the question then is what conditions can we impose

14   that will reasonably assure his return to court.  I had

15   previously said let's let him out of the house a couple of

16   hours a day.  I'd be glad to have him under home confinement 24

17   hours a day.

18             The house where he'd be living in is in Spring Valley.

19   I was born in Queens.  We didn't travel outside of the city

20   very much in my youth, but I think Spring Valley is pretty far

21   away from any of the local airports or any of the other modes

22   of transportation.  And given that he doesn't have a passport,

23   I think it does beg the question, How actually does someone

24   think he would flee?

25             THE COURT:  I have had cases, they are admittedly

J7HVOREC

1     rare, but they are not zero, cases before this very judge, let

2     alone before other judges, where defendants who had a strong

3     motive to flee, but were at a known location with an electronic

4     bracelet and so forth, nevertheless, were able to flee.

5          The first thing they did was make arrangements with

6     others to transport them often by boat.  The next thing they

7     did was to cut the bracelet.  And although the electronics are

8     better now than they once were, because not only electronic

9     limitations, but also manpower limitations and monitoring it,

10    there is often a delay of at least a few hours between the time

11    the bracelet is cut and someone focuses on the fact that it is

12    cut.

13         So I appreciate that your client can only do so much

14    in his circumstances.  It's not that -- the one case I had --

15    you mentioned Mr. Epstein.  I had a case involving a lawyer

16    named Marc Dreier who convinced me to allow him -- even though

17    he did not, in my view, have quite as strong a motive to flee

18    as I think your client does, he convinced me that he would stay

19    in his apartment 100 percent of the time and not only wear a

20    bracelet, but would, at his expense, employ armed guards.  And

21    I approve that only after it was agreed by all concerned,

22    including the government and the FBI and the marshals, that the

23    guards would be specially authorized to shoot if he left the

24    apartment, even for one second.

25         So I can conceive of situations where the motive to

J7HVOREC

```
1    flee can be overcome, and I think there's something to your
2    argument that the constitutional bail requirement would become
3    a nullity if one were to insist on something like what
4    Mr. Dreier had to produce in order to get released in his case.
5    But I don't see why you think that someone in Mr. Estrada's
6    situation, if he were of a mind to do so, couldn't flee.  I
7    don't want to go through the details of the each of the cases
8    where it's happened, but it's happened.  So I'm not just
9    speculating; I've had it happen in my court.
10          But let me hear from you on that.
11          MR. FEITEL:  I understand that a person with your
12   Honor's experience can always postulate or think back into the
13   history of the courthouse cases to find an extreme example of
14   somebody who violated the rules.  One question I have is with
15   what results.  I'm not familiar with Mr. Dreier.  I stopped
16   living in New York after I graduated from law school.  So if he
17   ultimately got caught and was brought back here --
18          THE COURT:  Because of the conditions, he remained in
19   his apartment, he was sentenced to 20 years in prison, and he
20   is still in prison.  I was just referencing that because of
21   your fair point that you couldn't provide an Epstein-like or,
22   in my case, Dreier-like kind of guarantee because the funds
23   aren't there.
24          But in the cases where someone did successfully run,
25   one case the person is still at large, two cases the persons
```

1    were eventually extradited from other countries, but in one

2    case it was, if I remember, correctly, four years later, and

3    the other about five years later.  So it was not an immediate

4    kind of thing.  But every case is different and it has to be

5    assessed on its own terms.  I really just want to suggest that

6    your argument that how is he going to flee is, I think,

7    inferentially contradicted by what happened in other cases.

8            MR. FEITEL:  In brief response, first, in order for

9    someone to flee under the conditions that we have proposed, it

10   would require that Mr. Estrada's custodian become a

11   co-conspirator with him, right.  Because if Mr. Estrada doesn't

12   have access to phones or tablets or Internet or anything else,

13   it would require some way, I think, for him to communicate or

14   someone to communicate on his behalf.  That, I think, is an

15   assumption that's a little harder to accept.  It would require

16   someone else to be willing to risk not merely their house or

17   their other interests that are financial, but their liberty

18   interest to make sure that Mr. Estrada got away.

19           The other point your Honor makes, which is that the

20   people came back, I worked as a prosecutor for more than two

21   decades, if someone fled in my case and they came back, I don't

22   believe that there would have been a favorable resolution of

23   the case.  I believe it would have been the end of any

24   opportunity that defendant ever had to get even a day off of

25   their sentence.

1          And so it would require -- when your Honor says that
2     you can always postulate someone fleeing, but the circumstances
3     here would require him to have some confederate to do so; and
4     it would make the endgame substantially worse than it is now.
5          THE COURT:  Well, but when one flees, one flees on the
6     assumption one is not going to get caught.  Under your
7     argument, no one would ever flee simply because they would know
8     that if they got caught, it would be worse for them.  That's
9     not, I think, a fair statement of the mindset of the people who
10    do decide to flee.
11         But let me ask you a different point.  What about
12    danger to the community?  I think the thrust of the
13    government's argument with respect to the tapes is that your
14    client did agree for a limited period of time to the killing of
15    one or more rivals or their associates, that he then thought
16    better of it.  But that was an agreement that he gave, even if
17    briefly, when he was not facing what he's facing now, which is
18    people who are going to be testifying against him in a very
19    serious criminal case in which he is the codefendant.
20         So if he were the sort of person who would
21    contemplate -- even if only briefly -- agreeing to the
22    immediate assassination of a political rival and perhaps her
23    two associates, why shouldn't I draw the inference that he
24    would agree and even seek to engineer the killing of the people
25    who would be testifying against him?

1           MR. FEITEL:  I'm going to follow with your Honor's

2      assumption that there was a brief period of time in which he

3      agreed to this and then changed his mind.

4           THE COURT:  No, I know you take a different view.

5           MR. FEITEL:  And also your Honor understands that in

6      my interpretation, the government informants keep coming at

7      him; he does a second time say, I don't want to do that.

8           So if the community that is at risk in this case is

9      the community of witnesses against him that your Honor

10     identified, then I think there's no reasonable possibility that

11     Mr. Estrada could do anybody any harm.

12          This is a case in which the overwhelming majority of

13     the evidence consists of the tapes and the transcripts that

14     were made against him.  I'm not sure that they are

15     self-authenticating, but the people who would authenticate them

16     would be government informants whose identities are protected

17     and unknown and might be able to testify under an anonymous

18     name.

19          But I think if your Honor has identified that the

20     heart of the danger in this case is those people who are

21     witnesses, then I think it is much more certain than not as in

22     a general -- like in a general case, if you commit a robbery

23     and you think that the witnesses are your next-door neighbor or

24     we saw you digging a hole and the like, that's a little

25     different.  These are people who are protected and who are

J7HVOREC

1    professional.  So I think that the risk in that sense, even

2    under your Honor's hypothetical, is extraordinarily low in this

3    case.

4              THE COURT:  Let me go back to the government.

5              So with respect to the danger to the community prong,

6    I think defense counsel is raising a fair point.  Who's in

7    danger?

8              MR. RICHMAN:  Thank you, Judge.

9              I think there's multiple answers to that, your Honor.

10             The first one I know defense counsel just referenced

11   that confidential sources made the recordings and they are at

12   the heart of the case, and that's true.  And for the reasons

13   that there are some safety concerns, I don't want to get into

14   too much detail about who those confidential sources are.  The

15   defendant certainly knows who they are, because he met with

16   them repeatedly.  They are individuals who are out in the

17   community, and we do believe potentially would be at risk.

18             We also think, your Honor, that in the heartland of

19   the defendant's conduct, which was an attempt -- albeit with

20   confidential sources -- to import tons of cocaine into the

21   United States, speaks to the fact that the defendant -- and

22   this is not the heart of our argument, but the defendant had

23   connections to other criminals; he talked about those

24   connections in certain recordings; he himself brought up the

25   name of a different cartel and a different drug dealer.  This

J7HVOREC

1    is not an isolated incident.  And he also had individuals who

2    were co-conspirators during the course of the case who are

3    still being investigated, who were involved in money laundering

4    and other activity.

5            So the defendant does pose a risk of harm both to this

6    community, if released, and certainly back to his home

7    community of Guatemala.  And, of course, I recognize that both

8    can suffice to establish the community that's placed at risk.

9            THE COURT:  All right.  Is there anything else either

10   counsel wanted to say on any issue before I rule?

11           MR. RICHMAN:  Not from the government, Judge.

12           Thank you.

13           MR. FEITEL:  No, sir.  Thank you, your Honor.

14           THE COURT:  First, I want to commend both counsel --

15   and especially defense counsel -- what I thought was excellent

16   argument.  It makes me look forward very much to the further

17   proceedings in this case, knowing, as I now know, what high

18   level of advocacy will be provided.

19           This is a presumption case.  But I'm going to assume

20   that enough has been brought forward that the burden shifts

21   back to the government.  So it's the government's burden to

22   prove by clear and convincing evidence either or both prongs of

23   the basis for detention.

24           In the end, I'm not going to rule on the danger to the

25   community.  I think that I'm very troubled by the tapes.  And

1    notwithstanding defense counsel's eloquence, I think the more

2    likely interpretation is that the defendant did agree -- albeit

3    briefly -- to the assassination of a political rival and

4    perhaps of her two associates as well.

5         However, I think in terms of who he would be a danger

6    to now, some of the witnesses are protected, others are persons

7    that it seems unlikely the defendant would easily have access

8    to, even through an intermediary.  So I think it's a close

9    question and one that if I were to resolve, I might need much

10   more specific information about.

11        But I'm not going to reach it because I do conclude

12   that the government has sustained its burden with respect to

13   flight.  Where perhaps I most strongly disagree with defense

14   counsel is in his suggestion that this defendant doesn't have

15   or only has a very modest motive to flee.

16        I think quite the contrary.

17        Here he is facing a mandatory minimum of ten years, a

18   possibility of life imprisonment.  All his meaningful ties are

19   with Guatemala or other places outside the United States.  And

20   his profile does remind me, frankly, of the few other cases

21   I've had where someone has fled, which is someone, all of whose

22   meaningful ties are outside and all of whose connections are

23   outside and who is facing strong evidence of very serious

24   charges.

25        I'd note in that regard that while we only briefly

31

J7HVOREC

1    discussed the evidence, the fact that most of the evidence is

2    recorded suggests that this is a strong case.

3            The bail package proposed, while not ideal, is, I

4    think, as defense counsel fairly says, as good a bail package

5    as one could expect from someone in Mr. Estrada's situation.

6    And that has weighed with the Court.

7            But the simple fact is, that for reasons that I've

8    already elaborated on, the limitations of the electronic

9    bracelet, the ability of people, even without a passport, to

10   flee the country and so forth, and the very strong motive to

11   flee that this defendant has, I think the government has shown

12   by clear and convincing evidence that no conditions of

13   release -- no reasonable conditions of release will assure this

14   defendant's return.  And so I will deny the motion for release

15   on that basis, and the defendant will remain detained.

16           Now, we have a conference coming up on July 29th.

17   And, of course, we'll have the codefendant's counsel present at

18   that time as well.

19           I wanted to flag though for defense counsel, who is

20   present, and for the government, that particularly when

21   defendants are detained, I think the Speedy Trial Act applies

22   with particular strength.  So we're going to be setting a trial

23   date at the time of the July 29th conference, not today.  But I

24   wanted to flag that I think we're looking at a trial maybe in

25   September or October, not in January or February or anything

J7HVOREC

1    like that, at least that's my initial inclination, subject, of

2    course, to hearing from counsel on July 29th.

3              All right.  Anything else we need to take up at this

4    time?

5              MR. RICHMAN:  No, thank you, your Honor.

6              MR. FEITEL:  No, thank you, your Honor.

7              THE COURT:  Thanks a lot.

8                              *    *    *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25