UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES | : | |
| v. | : | 19-CR-328 (JSR) |
| MARIO AMILCAR ESTRADA ORELLANA | : | |
| Defendant. | : | |

**<u>DEFENDANT'S MEMORANDUM IN AID OF SENTENCING</u>**

Robert Feitel, Esquire
1300 Pennsylvania Avenue, N.W.
Washington, D.C.  20008
D.C. Bar No. 366673
202-450-6133 (office)
202-255-6637 (cellular)
RF@RFeitelLaw.com

Counsel for Defendant Mario Estrada

# TABLE OF CONTENTS

**INTRODUCTION**   **1**

**FACTUAL BACKGROUND**   **3**

    *1. Childhood Of Poverty And The Will To Succeed*   *3*

    *2. Mario Estrada Becomes A Politician To Improve His Country*   *5*

    *3. The 2019 Election In Guatemala*   *5*

    *4. United States Informants Working In Guatemala*   *6*

**LEGAL OVERVIEW**   **9**

    *Federal Sentencing Guidelines*   **9**

    **Presentence Report Adjusted Guideline Calculation**   **10**

    **The Safety Valve**   **10**

        *1. The Facts*   **11**

        *2. Legal Analysis Re: Safety Valve Eligibility*   **14**

**FEDERAL SENTENCING FACTORS**   **17**

    **Defendant's Personal Characteristics**   **17**

    **Seriousness Of The Offense/Promote Respect For
The Law/Appropriate Punishment**   **20**

**CONCLUSION**   **24**

# TABLE OF AUTHORITIES

**CASELAW**

Gall v. United States, 552 U.S. 38, 47-48 (2007)                                    10

Kimbrough v. United States, 552 U.S. 85, 109 (2007)                                  9

Rita v. United States, 551 U.S. 338, 351 (2007)                                      9

United States v. Bala, 236 F.3d 87 (2 Cir. 2000)                                    22

United States v. Booker, 542 U.S. 220 (2005)                                         9

United States v. Carmona-Rodriguez, 2005 WL 840464 (S.D.N.Y)                        23

United States v. Cromitie, 2011 WL 2693297                                           2

United States v. Flaharty, 295 F.3d 182, 193 (2d Cir. 2002)                         16

United States v. Jayyousi, 657 F.3d 1085, 1171 (11 Cir. 2007)                       23

United States v. Lopez, 17 Cr. 323 (S.D.N.Y)                                        22

United States v. Martinez, 2007 WL 593629 (D. Kan)                                  23

United States v. McLean, 199 F.Supp. 3d 926 (E.D. Pa 2016)                          21

United States v. Mellon, 393 F.3d 175 (D.C. Cir. 2004)                              15

United States v. Pepper, 562 U.S. 476, 492 (2011)                                   23

United States v. Rioux, 97 F 3d. 648 (2nd Cir. 1996)                                19

United States v. Rizzo, 349 F.3d 94 (2d Cir. 2003)                                  15

United States v. Smith, 2009 WL 249714 (N.D. Ohio)                                  20

United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994)                                24

United States v. Studley, 47 F.3d 569, 574 (2d Cir. 1995)                           15

United States v. Takei, 941 F.2d 738, 744 (9th Cir. 1991)                           19

United States v. Woods, 159 F.3d 1132, 1136-37 (8th Cir. 1998)                      19

Federal Statutes, Laws, and U.S. Sentencing Guideline Sections

18 United States Code Section 3553(f)(2).                          14

18 United States Code Section 3553(e).                            2, 17

U.S.S.G. Section 1B1.1(b)(A)                                      10

U.S.S.G. Section 2D1.1(b)(2).                                     10

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES | : | |
| v. | : | 19-CR-328 (JSR) |
| MARIO AMILCAR ESTRADA ORELLANA | : | |
| Defendant. | : | |

## **DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

### **INTRODUCTION**

Defendant Mario Estrada is pending sentencing before this Court, after the prompt entry of a guilty plea to a lesser included offense of the drug trafficking conspiracy charged in Count One of the Indictment. As part of the plea agreement, the Government also agreed to dismiss the weapons charge contained in Count Two of the Indictment. The plea agreement expressly provides that the defense can argue that Estrada is safety valve eligible, which would permit this Court to impose a sentence below the five year mandatory minimum.

Once a viable candidate for the Presidency of Guatemala, as the result of a clandestine undercover operation conducted by DEA informants, Mario Estrada is now a federal prisoner in New York City, incarcerated thousands of miles from his home and loved ones. He has lost his good name and reputation, his political future, his freedom – and more importantly, the chance to be with his family and raise his youngest child. The two things he has not lost, however, are his hope and his faith.

The defendant understands – and accepts - that he finds himself in this position because of his own conduct and accepted responsibility for his actions. But any neutral and dispassionate analysis of the facts of this case demonstrates that the Government's informants manipulated the defendant at every turn. They took advantage of his deeply held desire to be elected President for

the betterment of Guatemala, to lure him into a fictional drug deal. At a more fundamental level, this case raises serious questions about the propriety of the United States law enforcement conducting an undercover operation in the sovereign nation of Guatemala against a person actively running for the Presidency. It is almost certainly the case that if this situation was reversed and the Government of Guatemala conducted an undercover operation on American soil against a presidential candidate and then lured him to Guatemala and arrested him, the full weight and fury of American power would be brought to bear until he was released.

As explained in this memorandum, the defendant's presumptive sentencing guideline vastly overstates his criminal conduct. In that regard, the Government informants artificially inflated the quantity of cocaine attributed to the defendant. See, e.g., United States v. Cromitie, 2011 WL 2693297 (McMahon, J.)(discussing sentencing entrapment and manipulation). Moreover, all of the sentencing factors contained in 18 United States Code Section 3553(e) support a significant downward variance. These factors include: (1) the defendant's age; (2) lack of prior criminal history; (3) motive; (4) family support; (5) charitable deeds; and (6) the need for just punishment.

Thus, for all of the reasons set forth in greater detail in this memorandum, the defense requests that the Court impose a sentence in this case of one year and one day. Mario Estrada has never before been in trouble with the law; rather, he was a patriot and devoted much of his adult life to public service. Upon the completion of his sentence in the United States, he wants nothing more than to return to his home in Guatemala to try and rebuild the remnants of his life. As demonstrated by the nearly thirty letters to be submitted as Exhibits to this memorandum, he will have the extraordinarily strong support of his family and friends upon his return. The letters also explain his commitment to charity and memorialize his good deeds, which include providing

wheelchairs to "children, youth and the elderly," donating "baskets with food and groceries . . . and toys to children," as well as "medical attention, mortuary boxes as well as funeral expenses to poor families." All of these matters support the sentence requested in this case. It is axiomatic that incarceration is not the only recourse of the criminal justice system and that a person should not be judged solely by the worst mistake he has ever committed in his life.

## FACTUAL BACKGROUND

In order to help provide context for the sentencing in this case, the following is a summary of defendant Mario Estrada's personal history.

### 5.   *Childhood Of Poverty And The Will To Succeed*

Mario Estrada was born into abject poverty; he and his five siblings were raised in a ramshackle house in rural Jalapa, Guatemala, with no electricity or even indoor plumbing. He had to walk to a nearby well and haul buckets of water back to the family home for cooking and bathing. The family was often hungry and sometimes was reduced to one meal a day. While Mario recalls that they were "poor but very happy," that is undoubtedly his recollection looking back through the lens of history. He suffered a level of poverty that few Americans have endured.

Despite - or perhaps because of these circumstances - Mario knew that obtaining an education was his only route towards a better life. But he also had family responsibilities and when he graduated from high school was obliged to find work. Jobs were rare in rural Guatemala during this era; Mario Estrada often even lacked the five cents for bus fare to travel to Guatemala City, some two hours away, to look for a job. After months of searching, however, he finally prevailed upon a town elder to help him get a job cleaning floors at a warehouse belonging to the *Ministerio de Fianzas Publicos*, which is the Internal Revenue Service of Guatemala.

Mario has explained that he was ecstatic to have the job; it meant that he could help feed and clothe his younger brothers and sisters. Better yet, the Government would pay for his continuing education. He began working in 1980 and over the course of the next fourteen years he slowly advanced his way up through the Guatemalan bureaucracy, ultimately becoming the Director of Taxation. During this time, he also attended college classes and after ten years of study received his Bachelor's degree in Engineering from the Universidad de San Carlos de Guatemala in 1990. This is the quintessential poor boy becomes success by dint of hard work story. While studying and working, Mario also volunteered his time to tutor other students in order to help them obtain their engineering degrees.

A government salary in Guatemala provided Mario a living wage, but not much more. Determined to provide more for himself and his family, Mario also opened a series of small businesses, first importing glassware and other home furnishings for resale. He also operated a building maintenance company and after a visit to the United States (and watching his countrymen laboring for others), started a gardening and landscaping business. He also had a real estate appraisal business. As the result of his educational background, he also managed his own engineering consulting firm. Some of the companies flourished, others did not last very long. Mario Estrada is not a stranger to hard work and he has known both success and failure in his life, but the one constant is his determination to provide for his family and friends and others in need.

### 6.   *Mario Estrada Becomes A Politician To Improve His Country*

Guatemala is a highly stratified society; the gap between the rich and the poor is enormous. [1] Mario witnessed this disparity first hand while working at the Department of Taxation. More importantly, instead of simply accepting the *status quo*, he resolved to try and do something to help reshape the contours of Guatemalan society. He began his political career by canvassing door to door for votes in his childhood neighborhood of Jalapa; in 1990, he was elected as a federal "diputado," which is equivalent to a member of the U.S. House of Representatives, serving two consecutive four year terms. He then took a hiatus from politics, but became increasingly concerned about the political divisions in Guatemala and the increasing social unrest. He was a founding member of the *Union de Cambio Nacional* Party ("National Change Union") in 2007 and was the party's presidential candidate in the national elections of 2007, 2011, 2015 and 2019. He received a respectable amount of the popular vote in the first three elections; his contacts with the DEA's undercover informants would ultimately lead to his arrest in this case.

### 7.   *The 2019 Election In Guatemala*

The 2019 election was to be Mario Estrada's last. The outgoing President, Jimmy Morales, had been accused of corruption while in office and Mario was hoping that the populace wanted a change of leadership. Guatemalan politicians are closely aligned with their parties and for the 2019 election, the party designated Juan Pablo Gonzales (co-defendant in this case) to

---

[1] The Central Intelligence Agency's *World Factbook* notes that "the distribution of income [in Guatemala] remains highly unequal. . . . More than half of the population is below the national poverty line, and 23% of the population lives in extreme poverty… " See www.cia.gov/library/publications/the-world-factbook/geos/gt.html.

manage Mario Estrada's campaign. Although Juan Pablo Gonzalez came from a well-known political family in Guatemala, the men were relative strangers to one another.

Moreover, although Juan Pablo Gonzales had originally indicated that he intended to run for a position as a "diputado," candidates are expected to finance (or obtain financing) for their own Congressional elections. Gonzales was having serious financial problems at the time and ultimately designated someone else to run for his seat. That "someone else" turned out to be a DEA informant who was related to a high ranking Government official.

A presidential campaign in Guatemala is conducted in two stages. All of the candidates face off in the first round of the election and then the two top candidates face off in a second round election. Mario Estrada Mario ran a campaign based upon the slogan "Food, Security, Work" and was polling in fourth place in early 2019, when Juan Pablo Gonzalez introduced him to two men he would later learn (at the time of his arrest) were DEA informants, masquerading as members of the Sinaloa Cartel in Mexico. As noted, one informant was a member of Mario's own political party, which is one of the only reasons why Mario ever agreed to meet with the men in the first place. [2]

### 8. *United States Informants Working In Guatemala*

For reasons that are not known to the defense, the United States Drug Enforcement Administration decided to conduct an undercover operation in Guatemala in the middle the 2019

---

[2] The Government provided the defense with "summary," not verbatim transcripts of the tape recordings of meetings between the informants and defendants Mario Estrada and Juan Pablo Gonzalez. Parts of the transcripts are referenced herein. For identification purposes, CS-1 is the member of Mario Estrada's party; CS-2 identified himself as "Licenciado Rojelio," which translates as "Attorney Rojelio."

election cycle. [3] It is important for the Court to understand the sequence of events in order to place Mario Estrada's conduct in context. Juan Pablo Gonzalez met with the informants twice before they were ever introduced to Mario Estrada. Gonzalez knew the purpose of the meetings was to receive a proposal from drug traffickers to help fund the campaign and that there was to be, in the common vernacular, a "*quid pro quo*" for the "contributions." Mario Estrada did not.

Moreover, it is undisputed that Juan Pablo Gonzalez used his very first meeting – when he was alone with the informants - not only to solicit what he believed were drug proceeds to support the campaign, but also as an opportunity to raise the issue as to whether the informants could assassinate certain political rivals. A DEA report which summarizes a meeting on February 7, 2019 between Gonzalez and one of the informants noted that:

> When CS1 asked GONZALEZ how else the cartel could help the campaign, **GONZALEZ asked if CS1's cartel could assassinate several persons** who could become a problem for their campaign in the near future. GONZALEZ identified the following targets. . . . (emphasis added).

Gonzalez also discussed with the informants how to "handle" Estrada and to demand that he agree to appoint people to various positions in the Government of Guatemala if he won the election. Gonzalez was clear that the informants should be aggressive in their approach:

> GONZALEZ told CS-1 and CS-2 to tell ESTRADA "[t]his is what I want, I want the Interior, I want Defense, I want the airports. . . and the Ports. . . "

In addition, the cooperators offered Gonzalez five percent of the proceeds of any drug shipments that were transported through Guatemala. All of this was done without Mario Estrada's knowledge. At the time, Gonzalez was having serious financial problems.

---

[3] The prosecution has advised the defense that Estrada was not the original target of the undercover operation, but has declined to state whether the Government of Guatemala was notified and/or ever approved of the use of United States informants in their country.

The idea of murdering other politicians was a constant theme with Gonzalez. On February 14, 2019, Gonzalez again met with the informants by himself in Hialeah, Florida. During the meeting, he returned to the theme of assassination. The conversation is memorialized in the following excerpt from a DEA report, in which he emphasized that the killings needed to take place:

> During the UC meeting in Hialeah (Miami), Florida, GONZALEZ indicated to the UC and CS that targeted murders of their political rivals in Guatemala are necessary in order to aid ESTRADA's chances to be elected to high office.
>
> and
>
> UC, then questioned GONZALEZ-MAYORGA about his timeline for the assassinations to which he advised 25 days and added that the assassinations needed to be done quietly as to not raise too much suspicion.
> …………..
>
> **UC asked GONZALEZ-MAYORGA if he would be providing the necessary equipment to preform [sic] the assassinations to which he replied "Yes I can get you AK-47's,** they are easy to get". GONZALEZ-MAYORGA stated that the assassinations needed to look like a domestic violence murder/suicide situation because it would provide a better storyline due to there [sic] sexual orientation. UC asked GONZALEZ-MAYORGA, if he could provide a hotel room where he (UC) could stage and conduct the killing. GONZALEZ-MAYORGA stated that they would provide the hotel (emphasis added).

After these meetings - to which he was not a party - Mario Estrada was also introduced to the informants under the false pretext that they could help finance his campaign.  Prior to the first meeting, no mention was made that the meeting would be with supposed drug traffickers. Subsequently, during the course of several meetings, Mario Estrada did agree to accept money from a drug trafficking organization to help fund his campaign and that *in the event that he won the election*, to assist the supposed organization in the future with access to the Guatemala's ports and airports. The informants dominated the conversations, alternatively praising Estrada and offering him riches from their imaginary future drug sales. But the despite the inducements,

Mario Estrada makes it clear that he wants the money for the campaign, not for personal

enrichment. According to the transcript of a meeting on February 8, 2018 between Estrada and

CS-1, the following transpired:

> [CS]1 says Mario's cut won't be for 10 or 20 kilo loads, but rather 40 to 50 ton
> loads in a 2 month period.

> [CS]1 asks for an exact amount and Mario repeats between 10 and 12, **insisting he will
> not need any money for himself**, only for the campaign. Mario says he has to deliver a
> sizeable amount of money to each of the 22 districts so that they move quickly and get
> him the necessary votes in each town. Mario wants an overwhelming presence to
> motivate the country to vote for him (emphasis added).

The Government has alleged that defendant Estrada also agreed that if he prevailed in the

election, he would appoint people to positions of authority in Guatemala after receiving names

from the informants. Of course, none of this came to pass.

Finally, the defendant had additional conversations with the informants concerning how

to move the cartel's funds to Guatemala. He also received ten thousand dollars in cash from one

of the informants, who told him that it was reimbursement for his expenses. In the final analysis,

however, the defendant took absolutely no affirmative steps to help the informants.  He was

arrested in Miami, Florida on April 17, 2019 after being lured to the United States. He has

remained in custody ever since.

## LEGAL OVERVIEW

### *Federal Sentencing Guidelines*

In <u>United States v. Booker</u>, 542 U.S. 220 (2005), the Supreme Court ruled that the federal

sentencing guidelines were no longer mandatory, but merely advisory upon the district courts.

Federal district court judges are no longer reduced to the status of automatons, simply calculating

a guideline sentence and then being required to impose it. Rather, the current regime is premised

on flexible sentencing, after consideration of both the guidelines and the defendant's individualized personal circumstances.

Thus, while a sentencing court will generally begin its analysis with reference to the relevant guideline range, it should entertain arguments from the parties as to whether a non-guidelines sentence is appropriate. Rita v. United States, 551 U.S. 338, 351 (2007). In making this decision, the trial court should generally consider the other sentencing factors set forth in 18 U.S.C. Section 3553(a). Kimbrough v. United States, 552 U.S. 85, 109 (2007). The district courts have discretion to impose a non-guideline sentence based upon their assessment of each individual case. See Gall v. United States, 552 U.S. 38, 47-48 (2007)(abuse of discretion standard applies to review of sentence outside guideline range and there is no mathematical test for reasonableness of sentence).

With these admonitions in mind, this memorandum analyzes the guideline sentence and the other relevant sentencing factors as they apply to this case.

**Presentence Report Adjusted Guideline Calculation**

In this case, the Presentence Report computes the defendant's guideline calculation as follows:

| | |
|---|---|
| Base Offense Level (450 kgs of more of cocaine) | 38 |
| Threats | +2 |
| Downward Adjustment Acceptance of Responsibility | -2 |
| Early Entry of Plea | -1 |
| Safety Valve – U.S.S.G. Section 5C1.2 | -2 |
| Adjusted Total Offense Level | 37 |
| | (210-262 months) |

**The Safety Valve**

10

In this case, as a required condition of the plea offer, the Government insisted that the defendant agree to an upward adjustment pursuant to U.S.S.G. Section 2D1.1(b)(2), which states, in relevant part, that a two level upward adjustment applies because the defendant "made a credible threat to use violence." Prior to the entry of the plea, undersigned defense counsel submitted a comprehensive letter to the prosecution, arguing that the upward adjustment: (1) did not apply to defendant Estrada; and (2) even if it did apply, the adjustment did not automatically preclude eligibility for the safety valve. As a result, the Government amended the written plea offer to specifically permit counsel to argue this legal issue before the Court. The Government reserved its right to oppose. [4]

The following section reviews the factual predicate for this enhancement in detail as it applies to defendant Estrada and the accompanying legal analysis concludes that even assuming *arguendo*, the upward adjustment applies, under clear canons of statutory construction, it should not prevent the defendant from being safety valve eligible.

### 3. The Facts

As previously described, any review of the facts reveals that the idea to kill other Guatemalan political rivals originated and continued to primarily be supported by co-defendant Juan Pablo Gonzalez. Gonzalez repeatedly mentioned the need for the assassinations and also offered to obtain automatic weapons to commit the murders. This stands in sharp contrast with Mario Estrada, who at best only fleetingly assented to the idea, but then almost immediately stated that he did not want to be involved with violence.

---

[4] The defense argued that the enhancement did not apply to defendant Estrada in the first place because: (1) he did not "make" the threat; (2) it was not credible; and (3) it was not within the scope of the conspiracy that defendant joined.

The only discussion that the Government relies upon to prove that "credible threats of violence" were made in this case took place on February 8, 2019 between Estrada, Gonzalez and the cooperators. In the transcript of the conversation, it is the informant – not Estrada – who first raises what could be considered the issue of violence, stating that:

> CS2: Then we have no problem, we can vanish this lady Thelma.
> Mario Estrada: Yes well, the lady I can win against. I know I can win.
> CS2: But it's a risk, right?
> Mario Estrada: The issue is that she's messing with everyone.
> CS1: She's organizing everything.
> Mario Estrada: She's messing with everyone.

The informant's suggestion to "vanish" Thelma is apparently a reference to Thelma Aldana, another Presidential candidate. And what is Mario Estrada's response?  It has nothing to do with violence or threats; it is simply that he "can win against her." This is not evidence of a credible threat.

As the conversation continues, the participants shift to a discussion of two lawyers that work for Thelma Aldana. The lawyers are named Francisco Sandoval and Oscar Schaad and were prosecutors assigned to an anti-corruption unit involved with election crime.

According to the Government transcript of the meeting, the remaining part of the conversation went as follows:

> Mario Estrada: Yes, because she [Thelma] has two attorneys who are dumb and obey her.
> Juan Pablo Gonzalez: What we need to do to those dumbasses is put a wooden stick up their ass.
> Mario Estrada: That's what that lady is doing, messing with everyone with those two bastards she has.
> Juan Pablo Gonzalez: Whoever comes here to fuck it up should just leave, or whoever comes to stir things up and who we consider to be a risk for you should leave too.
> Mario Estrada: But no! By the time they start assembling, it wouldn't be worth it.
> CS2: No, it's not going to be like that. The strategy is not like that. How much time do you think we have before we can hit that bitch?
> Mario Estrada: Now!
> Juan Pablo Gonzalez: Because right now would be ideal.

CS2: Alright well, that's fine, her and I need the names of those two bastards right away so I can start looking.
Mario Estrada: Francisco Sandoval and
CS2: Francisco Sandoval and who else?
Mario Estrada: Oscar Schaad.
CS2: Oscar what?
Mario Estrada: Schaad, who is from the electoral crimes.

In this excerpt, Mario Estrada complains about the lawyers and then Juan Pablo suggests that they "put a wooden spoon up their ass." This is obviously a vulgar colloquial expression, but it's certainly a far cry from Juan Pablo Gonzalez's prior insistence on assassinating his political rivals. Moreover, it is hardly a "credible threat" to use violence. [5] As the conversation continues, Estrada complains that this "lady is messing with everyone with these two bastards," but that also is not a threat.

Juan Pablo Gonzalez then states that whoever "we consider to be a risk for you should just leave." Even assuming that this is a reference to Mario Estrada's political opponents, it is not clear what Gonzalez means or that it somehow constituted a threat. Moreover, Mario's response is that by the time "they start assembling, it won't be worth it." The statement is susceptible of various meanings, but one likely interpretation is that even if Thelma and her lawyers begin investigating them, it would be too late, if Mario wins the election. But in no way does this passage constitute a threat.

The final part of the conversation is the section that the Government relied upon as a predicate for the threats enhancement. In this passage, the informant – not Mario Estrada - returns yet again to the theme of violence and obliquely asks when they can "hit that bitch." In

---

[5] Unlike the earlier conversations involving only Juan Pablo Gonzalez and the informants, during this meeting, Gonzalez does not volunteer details about obtaining automatic weapons to conduct the murder. We believe this was an intentional effort by Gonzalez to obscure these facts because he knew that Mario Estrada would never agree to the use of such violence.

the context of the larger conversation, it appears that he was not necessarily referring to Thelma. While Mario Estrada responds "now," and then the informant asks for the names of "those two bastards" and Estrada provides the names of the prosecutors. At least the informant believed the reference was to the two attorneys.

There can be no legitimate dispute that Francisco Sandoval and Oscar Schaad were not candidates for the Presidency (or any other public office) in Guatemala at the time of this election. Rather, they are prosecutors who were involved in anti-election fraud investigations. So even adopting a "best case" scenario for the Government, defendant Mario Estrada's one word answer "now," seems to be directed at the prosecutors and not his political rivals.

Against this somewhat ambiguous evidence of threats, it is undisputed that at a meeting on February 12, 2019, Mario Estrada unequivocally disavowed any involvement in the use of violence. The DEA report of his meeting states as follows:

> CS1 then inquires about the killings that they (CS1, CS2, ESTRADA and GONZALEZ) had spoken about in previous meetings, and furthered that his/her people have begun their homework. ESTRADA replied that that was GONZALEZ' idea. That that stuff will follow you forever, bad karma. The CS then no longer discussed the subject.

The informant raises the issue of violence, as part of the script to obtain incriminating admissions from Mario Estrada. Instead, Mario explains that the idea originated with Juan Pablo Gonzalez and he wants nothing to do with it. After Mario told the cooperator that he wanted nothing to do with violence, the cooperator "no longer discussed the subject." This was an intentional effort to prevent Mario Estrada from making any additional exculpatory statements and having them be part of the permanent record of this case.

### 4. *Legal Analysis Re: Safety Valve Eligibility*

The starting point of this analysis is of course with the unambiguous statutory language in the "safety valve" provisions contained in 18 United States Code Section 3553(f)(2). This

statutory language does not perfectly mirror the requirements of the sentencing guideline enhancement; it has an additional requirement. Thus, a defendant is only ineligible for the safety valve when he makes a credible threat of violence that is "**in connection with the offense**." It is fairly simple to postulate a case in which a defendant makes a credible threat of violence, but it is not "in connection" with the pending criminal case. In context, the "in connection" requirement should be construed as being co-extensive with the "in furtherance" requirement embodied in both federal conspiracy law and the federal sentencing guidelines themselves.

The federal sentencing guidelines specifically limit the application of jointly undertaken criminal activity" to matters that are:

(i) within the scope of the jointly undertaken criminal activity,
(ii) in furtherance of that criminal activity, and
(iii) reasonably foreseeable **in connection** with that criminal activity;

U.S.S.G. Section 1B1.1(b)(A)(emphasis added).

The Second Circuit has held that in order to determine what activity is "jointly undertaken," the court "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e. the scope of the specific conduct and objectives embraced by the defendant's agreement* )." United States v. Studley, 47 F.3d 569, 574 (2d Cir. 1995). Thus, in United States v. Rizzo, 349 F.3d 94 (2d Cir. 2003), the Court of Appeals reversed the district court's finding that the defendant's fraud conviction should be enhanced by two points because it involved the enhancement for the possession of stolen documents. The Government was unable to prove that the theft of such materials was within the scope of the defendant's agreement. Indeed, even knowledge of the illegal activities of other members of the conspiracy is an insufficient basis to attribute the conduct to the defendant for purposes of sentencing enhancements. See United States v. Mellon, 393 F.3d 175 (D.C. Cir. 2004)

(defendant's knowledge that his wife had hidden stolen merchandise in their home did not impute value of items to his sentencing guideline calculation when it was not within the scope of his criminal agreement).

Similarly, in this case, any threats were not within the scope of defendant Estrada's agreed-upon criminal conduct and thus not made "in connection" with the charged conspiracy. Estrada pled guilty to Count One of the Indictment, which charged him with conspiracy to "manufacture, possess with intent to distribute, and distribute a controlled substance, intending knowing and having reasonable cause to believe that such substance would be unlawfully imported into the United States." The Indictment does not allege any overt acts involving threats or violence. If the Government's theory is that Mario Estrada is responsible for the threats against other politicians in Guatemala and that they were made  "in connection" with the conspiracy, then it is the prosecution's burden to connect the threats to the case. But on its face, the threats appear to be directed against the prosecutors, which is extraordinarily more attenuated and part of this case and would not be "in connection" with the drug trafficking charge.

Moreover, it is undisputed that almost immediately thereafter the defendant unequivocally indicated that he did not want to participate in any violence and communicated his decision to one of the informants. The informant immediately changed the topic and thus prevented the defendant from making any additional, contemporaneous statements about this topic. But Mario Estrada's comment constitutes a complete renunciation – and withdrawal - from this aspect of the case. and ended his participation with respect to any threats. See, e.g., United States v. Flaharty, 295 F.3d 182, 193 (2d Cir. 2002)(withdrawal from conspiracy takes place when affirmatively withdrew from the agreement and unequivocally communicated this to the other members of conspiracy). To hold otherwise, would mean that as the result of one or two

16

words uttered during the course of numerous meetings with the cooperator, Mario Estrada would be facing a five year mandatory minimum sentence. This seems patently wrong under the totality of circumstances. Thus, the defense urges this Court to conclude that safety valve applies in this case, which means that the Court has the discretion to impose a sentence below the mandatory minimum

With that predicate, this memorandum now analyzes the appropriate sentence in this case.

## FEDERAL SENTENCING FACTORS

Under the federal sentencing statute, 18 United States Code Section 3553(a), the factors to be considered in the imposition of sentencing include: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentencing to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment; (3) specific and general deterrence; (4) the need to provide the defendant with training, medical care, or treatment; available sentencing alternatives; (5) consistency in sentencing among similarly-situated defendants; and (6) the need to provide restitution. See 18 U.S.C. § 3553(a).

All of these factors support the downward departure requested by the defense.

**Defendant's Personal Characteristics**

Defendant Mario Estrada Amilcar is a sixty year old Guatemalan citizen. As the Court now knows, the defendant lifted himself up from poverty to become a leading member of Guatemalan society. Apart from his public life, however, Mario Estrada was also privately dedicated to family and community.

He is the father of five children, who range in age from thirty to seven years old. His first wife, Alma Leticia died of cancer after eighteen years of marriage. His children have written this Court, expressing their unreserved love and support and asking for a merciful sentence. These

letters are submitted as Exhibit 1. His twenty-four year old daughter Maria wrote of her father that:

> Thanks to him I have learned about humility, solidarity, effort, perseverance, and dignity because he contributed with many Guatemalans in need to progress, supporting them with education, health and basic needs that have made them remember him with much love and admiration for his great heart, helping in many occasions families to overcome obstacles and some villages to have better opportunities and life quality. Also, he has been an example for many Guatemalans because he was born in a poor family and always worked hard to study to support his family and always helping others in need.

The theme of family and devotion are a constant in the letters from his children. His oldest son, Mario, Jr. explained:

> My father has been a hero in my life, despite his multiple occupations, he has always been a personal and family support. He has always given quality time to his family, watching tirelessly for his family to professionally succeed in every moment. I thank my father for my education, profession, but most importantly I thank him for his love and nobility instilled since very small.

And finally, his second old son, Eduardo explained:

> My father widowed when I was just 12 years old; I can imagine that losing my mother was very hard for him. However, since then, he has played the role of father and mother at home, worrying to look after us, educating and persevering so we did not miss anything. I am very thankful to God for having the Father he gave me because his authenticity and tenacious character are worth imitating.

The family is aware of the magnitude of their father's error and the events that led him to the sentencing in this case. His son Eduardo, who has been able to visit him at the Metropolitan Detention Center in Brooklyn, understands and acknowledges the shame and regret that now cling to his father. But more importantly, the son knows that his father is repentant:

> I assure your honor that my father Mr. Estrada is repentant for his mistakes, before judging him we must recognize that he is human as we are and human beings sometimes make mistakes. However, we must be sure that our mistakes teach us and we learn from them. I am sure my father is a noble parent with a great heart and the day he is back in our country will be in a position to keep working for the ones in need and amending his mistakes. My father is God-fearing and with an immense love for his country.

The defense has submitted to the Court photographs of the defendant with his family, as well as a poignant and heartbreaking letter from his seven year old son.

In addition to his family, members of the community have also written to the Court to express their support for Mario Estrada and to catalogue his good deeds. Those letters are attached as Exhibit 2. There is an old adage, that one way to judge a person is by the quality of his acts when they think no one is watching. In that regard, the comments from Mario's neighbors affirm the depth of his humanity. One long-time neighbor wrote that "I personally realized he was always supporting poor people providing shelter and food when they needed the most." Another friend for more than thirty-five years was even more effusive:

> Here in Jalapa, Guatemala he [Estrada]is known as the TOWN'S FRIEND, for his good heart, altruist who helps who is needed. He helped people in need, especially the elderly. He supported church constructions, educational institutions, recreative environments, street pavements, and avenues. I conclude by saying Mr. Estrada has always sought the common benefit.

These acts of charity are also the basis for a downward departure. Courts throughout the United States have held that exceptional charitable contributions are a valid  ground for departure.  See United States v. Woods, 159 F.3d 1132, 1136-37 (8th Cir. 1998) (exceptional charitable contributions are grounds for downward departure); United States v. Rioux, 97 F 3d. 648 (2nd Cir. 1996) (not abuse of discretion to downwardly depart based on community contributions and defendant's health issues); United States v. Takei, 941 F.2d 738, 744 (9th Cir. 1991) (outstanding good deeds are proper grounds for downward departure.

All of Mario Estrada's charitable acts predated his arrest in this case; they were done as the result of his humanity and humility, not to curry favor with the Court.  They are the best demonstration of who Mario Estrada is as a human being. Moreover, Mario sought neither

19

thanks nor public accolades for his help; he took quiet satisfaction in knowing that he had bettered the lives of others less fortunate.  He helped others because it was the right thing to do.

Along with his own acts of charity, Mario helped direct Guatemalan government resources to his hometown, where there was a dire need for improvement. One resident of his hometown in Jalapa, explained how much change Estrada was able to bring about.

> I also witness of the support he provided to many of my people, contributing to the city of Jalapa development improving the city's infrastructure, roads, remodeling the municipal stadium, the Central American Men Institute ( INCAV Jalapa), building the municipal coliseum, benefiting a society. He is a great dreamer, wanting to see his loved Guatemala distant from underdevelopment, in which currently finds itself because we Guatemalans have very few opportunities and I personally thank God and Mr. Mario Estrada for having the opportunity to work as teacher in one of the most prestigious institutions of the city of Jalapa, just as other of my people did.

The defendant has written this Court a letter accepting responsibility for his criminal conduct, candidly admitting that he made a grievous mistake when he became involved with the informants in this case. He wrote that he will never be involved in such matters again – no matter what the temptation – and there is every reason to believe that promise.

**Seriousness Of The Offense/Promote Respect For The Law/Appropriate Punishment**

The Court's responsibility is to fashion a sentence that promotes respect for the law and to reflect the seriousness of the offense is in some respects an existential quest. But as at least one district court judge has noted "it is not always necessary to incarcerate a defendant to promote such respect and demonstrate the seriousness of the crime." United States v. Smith, 2009 WL 249714 (N.D. Ohio).

There is no doubt that the crime for which the defendant pled guilty is a serious offense. International drug trafficking is a very destabilizing force in South and Central America and has devastated countless lives in the United States. But defendant **Estrada's actual conduct** in this case is exponentially overstated by the quantity of cocaine attributed to him.

As an initial matter, it is clear that the defendant did not search out the informants; rather they were brought to him by Juan Pablo Gonzales, who was a member of the party's inner political circle and cooperator 1, who was not only a party member, but is related to a prominent political family in Guatemala. Moreover, the defendant took no actual steps to aid in the alleged drug trafficking scheme, beyond the conditional promise to help the informants, **if he won the election**. Likewise, it is clear that the well-coached and experienced informants directed the conversation to suit their purposes. The informants casually – but undoubtedly as part of their script - mentioned moving large quantities of cocaine to the United States and making payment to the defendants from a drug shipment that was to be sold in New York. In reality, as to Mario Estrada, there was no cocaine in this conspiracy. [6]

Indeed, the very notion that the informants were going to send very large shipments through Guatemala if Estrada won the election is largely, if not completely, a fiction.  The Government tacitly admitted this when it offered the defendant a plea offer to the lesser included offense of 500 grams of cocaine. Moreover, undersigned counsel has been involved in cases involving international drug trafficking (both as a federal prosecutor and defense attorney) for more than twenty years. Drug traffickers never begin what would be referred to as a new route, by dispatching large quantities of cocaine. Rather, they always begin with a small shipment, in order to minimize their risk until they are able to gauge that the route is secure. [7]

The law recognizes that this Court can grant a downward sentencing variance when informants manipulate the amount of drugs in a case in order to avoid a miscarriage of justice.

---

[6] This stands in sharp contrast to Juan Pablo Gonzalez, who was taken by the informants and other DEA agents posing as drug traffickers to a location in Florida, and shown a shipment of "sham cocaine."

[7] The money that the informants promised to pay Estrada was supposed to be the product of prior drug sales and is thus not a part of the charged conspiracy.

In the recent case of <u>United States v. McLean,</u> 199 F.Supp. 3d 926 (E.D. Pa 2016), for example, the district court conducted an exhaustive review of the concepts of "sentencing entrapment" and "sentencing factor manipulation," in the context of an undercover informant operation by the ATF. In describing the methodology of such law enforcement actions, the Court concluded that:

> sting operations are arbitrary and indiscriminate when it comes to the initial identification of suspects. Essentially, the Government relies upon a confidential informant to troll for individuals who might fall prey to the sting.

199 F.Supp.3d at 934-35. These observations apply with equal force to the facts of this case.

The *McLean* Court ultimately decided to void one of the mandatory minimums in the case because it offended due process. The Second Circuit has likewise adopted the principal that sentencing entrapment can warrant a downward sentencing variance. <u>See</u>, <u>e.g.</u>, <u>United States v. Bala</u>, 236 F.3d 87 (2 Cir. 2000)(a downward variance for sentencing entrapment requires a showing of outrageous Government conduct). This Court knows from its own experience how pernicious the use of informants can be. <u>See United States v. Lopez</u>, 17 Cr. 323 (S.D.N.Y) ("[b]y their very nature, so-called "reverse sting" operations, in which the Government creates the illusion of crimes in order to catch would-be criminals, are open to potential abuse, since they are not cabined by the demands of reality, but only by the vagaries of imagination)(Opinion and Order 11/15/19).

It would be almost impossible to posit a more egregious set of circumstances than those in this case. The United States Government used dispatched informants to a foreign country to basically entrap a Presidential candidate. At the same time, the United States also recruited a member of defendant Estrada's own party to help legitimize the informants. No circumstances could justify the interference by the United States in the presidential election of an independent sovereign nation.

22

**Seriousness Of The Offense/Promote Respect For The Law/Appropriate Punishment**

The factor of specific deterrence also supports the requested sentence. The defendant has been clear that he never intends to be involved in criminal activity again. Indeed, he has told counsel that he will wash dishes or floors or drive a taxicab before he will be involved in such matters ever again. A letter from the defendant to the Court is Exhibit 3.

The defendant will be sixty old at the time of his sentencing, which significantly reduces his chance of recidivism. The Supreme Court has recognized that the likelihood that a defendant will engage in future criminal conduct is a "central factor" that district courts must assess when imposing sentence. United States v. Pepper, 562 U.S. 476, 492 (2011). This principle has been recognized in numerous cases where even a below guideline sentence was imposed as the result of a defendant's age. See United States v. Martinez, 2007 WL 593629 (D. Kan)(according to data compiled by the Federal Sentencing Guideline Commission recidivism decreases with age). Accord United States v. Jayyousi, 657 F.3d 1085, 1171 (11 Cir. 2007). See United States v. Carmona-Rodriguez, 2005 WL 840464 (S.D.N.Y) (district court noted that below guidelines sentence appropriate for defendants "who were over the age of forty on the grounds that such defendants exhibit markedly lower rates of recidivism"). The chance of recidivism for defendant Mario Estrada is virtually zero; he will return to Guatemala, where he has legitimate business interests.

As to general deterrence, it is clear that the United States is aggressively prosecuting international drug trafficking from Guatemala and other Central American countries. Federal prosecutors in New York and elsewhere have obtained the arrest and extradition of a very large

number of Central American drug traffickers. No further general deterrence would be accomplished by additional punishment for this defendant. [8]

Finally, the sentence imposed by this Court ought to account for the consequences of the defendant's status as a foreign national. First, there is an immigration detainer lodged against the defendant and such, he will not eligible to spend up to the last six months of his jail sentence under less restrictive conditions of confinement. In addition, Mario Estrada will spend additional time incarcerated in the United States following the conclusion of his criminal sentence. After his sentence is completed, the defendant will be transferred to an immigration jail somewhere in the United States. He will be there until the United States Marshals Service organize his return flight to Guatemala. The Marshals ordinarily wait until there are sufficient persons to be returned to Guatemala to make the flight cost effective. Thus, there is no principled way to determine how long the defendant will remain in immigration custody until he is actually deported, which could take months. Other federal courts have recognized that ineligibility for halfway house treatment and the additional period of incarceration pending deportation as a basis for a downward sentence variance. See United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994).

## CONCLUSION

The sentencing of any person is a complex task for the Court. Through the submission of this memorandum, the defense has tried to provide context to assist the Court in imposing a sentence that satisfies that requirements of the law and our notions of justice. For all the reasons

---

[8] The remaining sentencing factors are: (3) the need for consistency in sentencing; (4) the need to provide the defendant with training, medical care, or treatment; available sentencing alternatives; and (5) the need to provide restitution. They do not appear to apply to the facts and circumstances of this case. The defense requests that this Court not impose an order of restitution because there is no definable group of victims. See 18 U.S.C. Section 3663(a). Similarly, the defense requests that no fine be imposed.

set forth in this memorandum – his age, lack of prior contact with the criminal law, remorse, and

the circumstances involving the use of informants in a foreign country -  the defense asks this

Court to grant a downward variance and sentence Mario Estrada to twelve months and one day in

jail.

Respectfully submitted,

*Robert Feitel*

_____

Robert Feitel, Esquire
1300 Pennsylvania Avenue, N.W.
Washington, D.C.  20008
D.C. Bar No. 366673
202-450-6133 (office)
202-255-6637 (cellular)
RF@RFeitelLaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Defendant's Sentencing Memorandum was filed via the ECF system, this 6th day of February, 2020 upon Assistant United States Attorneys Jason Richman and Matthew LaRoche, U.S. Attorney's Office, Southern District of New York.

*Robert Feitel*

_____

Robert Feitel