UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 19 Cr. 328 (JSR)

MARIO AMILCAR ESTRADA ORELLANA,

Sentence

Defendant.

------------------------------x

New York, N.Y.
February 11, 2020
9:15 a.m.

Before:

HON. JED S. RAKOFF,

District Judge

APPEARANCES

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
JASON RICHMAN
Assistant United States Attorney

ROBERT A. FEITEL
Attorney for Defendant

Also Present: Erika De Los Rios, Interpreter (Spanish)
Paula Gold, Interpreter (Spanish)

                (Case called)

                MR. RICHMAN:  Your Honor, good morning.  Jason Richman, for the government.

                THE COURT:  Good morning.

                MR. FEITEL:  Good morning, Judge Rakoff.  Robert Feitel for defendant Mario Estrada.  With me at counsel table is my full-time paralegal, Mr. Suarez.  The government has no objection to his presence this morning.

                THE COURT:  Good morning.

                We're here for sentence.  The probation office has calculated the offense level as 37 and the criminal history category as I, for a guideline range of 210 to 262 months.  Any objection to that calculation?

                MR. RICHMAN:  Not from the government, your Honor.

                MR. FEITEL:  We do not object to the calculation.  We disagree with the presentence report as to whether or not my client is eligible for the safety valve or not.

                THE COURT:  Yes.  That's a separate question.

                MR. FEITEL:  Yes, sir.

                THE COURT:  I will adopt the total offense level of 37, the criminal history category of I, and the guideline range of 210 to 262 months.

                While I, frankly, don't think he's eligible for the safety valve, I will assume for purposes of the sentencing that he is because, to be perfectly frank, unless defense counsel

can persuade me otherwise, I don't see how he could possibly get a sentence here remotely like what defense counsel is recommending, which struck me, to be frank, as absurd.

But let me hear from defense counsel, and then I'll hear from government counsel, and then from the defendant if he wishes to be heard.

MR. FEITEL: Good morning, your Honor. I'll take the Court's comments to heart.

One of the reasons that I recommended the sentence that I did, with full understanding that it was far below where the guidelines were, was it seemed to me that if I was truly arguing in good faith that the safety valve did apply in this case, then you need to pick a period of time that was below the safety valve eligibility, which is five years in this case, and so I tried to pick what I felt would be the --

THE COURT: Safety valve makes him eligible for a sentence below the mandatory minimum. It does not dictate that it be a sentence below the mandatory minimum.

MR. FEITEL: No, it does not, but if I had asked for more than five years, I would not have taken the time to have argued in my pleadings that he was safety valve eligibility. It would have been largely a moot point.

Having heard your Honor's comments, I'd like to revise my recommendation for the Court. I'd like to ask your Honor to impose a sentence of 60 months, five years, the mandatory

minimum in this case. And having considered before I came here the possibility that your Honor might be inclined to not go -- to not accept my recommendation, I did take the time to look for cases that I thought were somewhat similar on the facts. And although it's not in my sentencing memo, there is a case from this jurisdiction before Judge Furman. It's called *United States v. Ghahremani,* 15 Cr. 793.

In that case, the defendant, who was a permanent resident of the United States but was a national of another country, also met with and basically conspired with government informants. In that case, he and his codefendant agreed to sell millions of rounds of bullets to people who they thought were actually representatives of the FARC, which is a terrorist group in Colombia. In that case, the defendant pled guilty to a drug trafficking offense and was sentenced to 66 months by Judge Furman. I think that Mr. Ghahremani's case was instructive, and that was a case in which his guideline was also at the high end of the guidelines because the quantity was more than 450 kilograms of cocaine. I think that Mr. Ghahremani was someone who did not have the personal history that my client does, and so I just want to address briefly the issues that I think are important here, your Honor.

The defense and the government have presented starkly different views of who Mr. Estrada is. The government has him as a blood-thirsty menace to society, and I think when they did

that, they took a small slice of his life and put it under a microscope and tried to convince your Honor that that's --

THE COURT: Here's the problem I think you face. Your client has a somewhat heroic upbringing. The letters I received on his behalf attest to the many good aspects of his character, but what does he decide to do? He decides that in order to get funding for his run for the presidency of Guatemala, he will agree with a vicious drug cartel to allow them to bring very large quantities of this poison into the United States using his position, his putative position if he's elected, and his ability to appoint people to various positions within the government as a way to facilitate this egregious crime. I don't see how that is anything other than despicable.

MR. FEITEL: There is no disagreement that what he did was wrong. I don't generally disagree with the Court's characterizations as being despicable. My position about it, and I want to be frank with your Honor, is I take no solace from what happened. I think that Mr. Estrada committed a egregious as crime, and I don't think anyone can say otherwise. But in contrast to some of the other cases, for example, that the government alludes to regarding the brother of the president of Honduras, Mr. Estrada's promise in this case was conditional, which was he would in the future, if elected, do A, B, C, or D. And because our criminal conspiracy law finds people culpable for the conspiracy at the earliest possible

moment when they reach the agreement, this conspiracy charge didn't even require an overt act. Because of that requirement, they capture Mr. Estrada before he actually does anything. I think it's left to the vagaries of chance to decide whether he actually would have gone through with this or not. He remains guilty notwithstanding, but it's a far cry to compare what the other defendants did in the Tony Hernandez case with Mr. Estrada.

THE COURT: Well, I think that point has some force, but less force in this case than it might in others because he was such a willing participant. All the evidence that I've seen suggests that he was not, as you try to maintain, in any sense entrapped -- of course, he waived any entrapment defense when he pled guilty -- but rather, that he embraced this as the way to advance his own power. And he was willing to sell his government, his people, his family, and the United States down the drain in order to get the funding to become president.

MR. FEITEL: In response, your Honor, I have read -- I understand the anger about this and the dissatisfaction. No one is disagreeing. And I want to be clear, the memo that I filed with this Court was not an effort to minimize his culpability. It's an effort to explain the circumstances. This is a case in which professional informants made contact with my client. Mr. Estrada is so naive that he takes no effort to try to even verify the bona fides of the informants,

and he doesn't do that because the people who come to him, one of whom is a U.S. government informant, are people of confidence with him, people of his own political party.

In my reading of the transcripts, I see this as different. I see Mr. Estrada as agreeing, but I see the informants as having prepared for what they did because at every turn they keep -- at every turn in the conversations, they return to the conversation about all the drugs and about all the money and about all the things because, as your Honor said in the *Lopez* case, the limits of what happens in cases of informants is only bridled by their imaginations, and that's what happened in this case to my reading of these transcripts. Mr. Estrada is a willing participant. He's not objecting. But the people that are controlling the narrative, that run the conversations, are the informants, and I would be willing to bet that before every meeting they had a group sitdown, and they went over the points that they needed to make in each conversation along with Mr. Estrada. I think that the biggest difference between this case and some of the others, again, is that he actually didn't do anything to make good on the promise. The promises were in absentia.

Mr. Estrada is a 60-year-old man. He's here from a country thousands of miles away. His family, his two children, are in court today to provide support for him. So the question that it comes down to is, assuming that he did what he did, how

much time in jail, how much punishment is necessary to punish Mr. Estrada?  The government is essentially asking for a life sentence, or at least for the better part of his life.  I'm 61. I'm going to hazard to guess that, although your Honor is very youthful appearing, you might be slightly older than I am.  I know the difference between my capacity at 50 to 60.  I assume the same change will take place from 60 to 70, and it might even be more advanced, and I have no hope past that because no one in my family's ever gone that far.  But if you give Mr. Estrada a five-year sentence, that is a significant --

THE COURT:  No, you look in pretty good shape to me.

MR. FEITEL:  Thank you, your Honor, as does your Honor.

But I think that it's a significant -- in all seriousness, it's a significant part of the rest of his life, and it's time thousands of miles from his friends and family. Foreign nationals who are incarcerated in this country, I think, suffer much more egregiously than people do who are locals.  They don't get visits.  They're not eligible for certain programs.  Their time is much more pressured than otherwise.  And then at the end of their sentences, they don't get to go home immediately.  They're not eligible for halfway houses as well.

I understand your Honor's dissatisfaction and the points about what my client did and how it affects larger

issues, but in the scope of what happened in this case, Mr. Estrada's -- his conduct starts, begins, and virtually ends when he signs -- when he agrees to do this, when he agrees to do this with the informants. Nothing further is ever taken. If he had done something more and used his office or his political party or done something affirmative in the course of the months that this took place to help the drug traffickers, I think we would be in a far different situation, but he did nothing other than agree to join with them to do this.

THE COURT: All right. Thank you very much. Let me hear from the government.

MR. RICHMAN: Thank you, your Honor.

Judge, I won't belabor our points. I think your Honor sort of hit on what we view as the heart of the disagreement here, which is the government is really focused on why we're here, which is because of what the defendant did. And what he did was attempt to sell his country out to the Sinaloa cartel, period. That's what the defendant wanted to do. He wanted to --

THE COURT: There's no question about that, but I think there's something perhaps to the defense point, which is true of many stings. It wasn't like he initiated this. He was a willing, eager participant, there's no question about it. The suggestion of entrapment is frivolous, in my view; but nevertheless, it was a sting. It was someone else coming to

him and saying, someone he trusted, saying, you know, let's do this crime. Oh, and while we're at it, let's up the ante and do an even better crime or a bigger crime. I think that is different --

MR. RICHMAN: Your Honor, that --

THE COURT: -- from a situation where he initiates.

MR. RICHMAN: That's a point very well taken, Judge. I don't necessarily disagree. I will point to a couple of facts here that I think mitigate against the force of that point in this case, Judge. One of them is that during the course of the investigation, the defendant bragged to the sources that he was also talking to other drug dealers. Those were not drug dealers who were sources. Those weren't CSs. Those weren't sting operations. The defendant told the sources, I'm talking to the Jalisco Nueva Generación cartel and also mentioned another Guatemalan drug trafficker who wanted to help him. The point about stings is very well-taken. I do think in this case, on these facts, the force of it is somewhat blunted by the fact that this wasn't the only nefarious conduct that the defendant was up to.

The other thing I would note in that regard, your Honor, is that -- to sort of rebut against the suggestion that the defendant didn't do anything, the reason he didn't do anything was because this was a sting. He had every desire to do something, but he also did take steps in furtherance of this

conspiracy. He himself traveled to the United States. He accepted $10,000 in cash on an undercover yacht that he thought was coming from a representative of the leader of the Sinaloa cartel. He was not sitting in meeting rooms just having idle conversation. He was traveling. He was having meetings. He also came up with ideas for moving drug money from the United States to Guatemala. He came up with a very detailed plan for flying a boat -- flying the boat that he met with the CSs on, that it would have a United States flag, that it would be helmed by certain people to move money from the United States in bulk to Guatemala. So the point is well-taken that this was a sting, and I understand sort of the ways in which that can mitigate against a case like this one, but I do think the force of that argument here is somewhat blunted.

So, again, I won't belabor too much, but I do think that is sort of where the disagreement comes into play. The government is really focused on what happened here, and what happened here was the defendant attempted to sell his country out. He attempted to move tons of cocaine to the United States for the Sinaloa cartel while he was hoping to become president of Guatemala. The seriousness of that crime can't be understated. That is a huge part of the cocaine epidemic that currently travails this country, and for that reason the government seeks a serious sentence.

Your Honor, I'm sorry. I did have one

guidelines-related question, and I don't know if now is the time.

THE COURT: No. Thank you very much.

MR. RICHMAN: Thank you, Judge.

THE COURT: I'll hear anything further defense counsel want to say and then from the defendant if he wishes to be heard.

MR. FEITEL: I promise to be brief, although that promise from lawyers is somewhat facetious.

THE COURT: It's important in any sentence to hear everything that anyone wants to say. I have other matters, but they take second place to a sentence. A sentence is the most important thing a court does. I'm happy to hear anything you have to say.

MR. FEITEL: With respect to the government's comments about Mr. Estrada saying he was working with other cartels, I think that's pure braggadocio. I don't know of any other evidence of record having done it. He did talk to some other people about helping to move the money, and that's the point that Mr. --

THE COURT: No, but I think, assuming it was just braggadocio, it shows how fully he embraced his new role as big, bad crook.

MR. FEITEL: So the question that it raises -- and I think it also goes to the heart of the matter, your Honor -- is

the government says my client took money and he talked about moving cash. That part is definitely the case. I think that if you look at this sort of somewhat objectively, obviously it's hard for both the litigants' representatives to be completely objective, but I think that this is about the money for Mr. Estrada. I think he saw this as a chance to get a lot of money.

And with respect to the government's contention that he attempted to do this or he attempted to do that, he attempted to do things about drugs, no, he promised that he would, and there is a difference between attempting, taking steps, and making a promise. Our law captures criminal liability for the promise, but in this case, the acts are minimal, and I think they mostly relate to money.

So having said that, I'd be glad to respond to any questions your Honor might have.

THE COURT: No, but let me hear from the defendant if he wishes to be heard.

THE DEFENDANT: Good day, your Honor. I humbly acknowledge the crime that I committed. Today I appear before you, your Honor, with all due respect to express to you that for quite some time I have fought for the welfare of my family, for the welfare of my country, which during my entire life I have always acted -- I have always taken the correct path.

I acknowledge that I have made a mistake for having

sat down with people from my party who, in one way or another, induced me to do this wrongdoing, but I do accept my wrongdoing.

My children are here, Eduardo and Manuel Alejandro, two professionals, and ever since their mother passed away, it's been difficult for me, but I have led them to lead the correct path in life.

Today, your Honor, I ask you for clemency, and I ask that you allow me to get on the right path again, to continue doing what's right for my country. The only objective that I have had is to work to attain the well-being of people who need it.

I want to repeat that I acknowledge my wrongdoing. Your Honor, with all due respect I sent your Honor a letter through my attorney.

THE COURT: Yes, I received it.

THE DEFENDANT: Thank you, your Honor.

And today, the only thing that I want to express to you is this request, and please allow me to return to my life and be more prudent in my actions. Thank you very much, your Honor, and may God bless you.

THE COURT: Thank you.

MR. FEITEL: Your Honor, finally, if I could ask for the Court to recommend that my client be designated to the federal correctional institute in Coleman, Florida.

THE COURT: I'm sorry?

MR. FEITEL: I would ask if your Honor would consider recommending -- I know it's not binding on the marshal service or the Bureau of Prisons -- that my client be designated to the federal correctional institute in Coleman, Florida.

THE COURT: Yes, I will do that.

MR. FEITEL: Thank you.

THE COURT: Although I assume you've told your client I can't order that; I can only just recommend it.

MR. FEITEL: I'm reluctant to tell anyone about the limits of a federal judge's authority, but we did discuss this.

THE COURT: So I think much of what seems to me pertinent has already come out in the colloquy. There are, prior to these events, many laudable things that could be said about this defendant, some of which has been expressed in letters to the Court which I greatly appreciate. He grew up in abject poverty. He overcame that. He became a good citizen. He did many good deeds. He was very supportive of his family. I give him credit for that, and I give him credit in real terms in terms of the sentence because I think, when it comes to a sentence, one has to look at the entire human being and his, as the statute says, personal characteristics as well as the crime that was committed.

But it is very hard for this Court, which has seen many, many, many sentences, still not to be shocked by what

this defendant agreed to do. It was precisely because of his laudable background that many people believed in him, that he became a candidate for president, that he created his own party, that people looked to him as someone who wouldn't be just another one of those all-too-frequent corrupt politicians. And yet, without any meaningful hesitation, he was perfectly happy, so that he could get the funds needed for his election, to betray everyone who had had trust in him and his very country.

But there's more. How was he going to betray it? He was going to betray it by allowing terrible drugs to be brought into the United States, and thus not only have a negative effect on his own country but a negative effect on our country. It was appalling. If I were to impose a sentence based solely on the acts he committed, even after taking account that it was a sting, and so forth, I would impose a sentence of more than 20 years. I am persuaded by all the positive things in this defendant's life that on this day of sentence he should receive some credit for it, but it only goes so far.

So the sentence of the Court is the defendant is sentenced to 15 years in prison, that's 180 months, to be followed by four years of supervised release, although that will probably be not served because of the deportation. A fine of $40,000 will be imposed as recommended by probation. This defendant is not in a position to pay any big fine, and in any

event, the prison term, I think, serves the necessary functions. There is, however, a mandatory special assessment of $100 which must be paid.

The terms of supervised release are, first, the mandatory conditions that the defendant not commit any federal, state, or local crime; that he not unlawfully possess a controlled substance; and that he cooperate in the collection of DNA. The drug testing condition is suspended based on the Court's determination that this defendant poses a low risk of personal future substance abuse. That's opposed to substance abuse that he would have imposed on others.

There will also be imposed standard conditions 1 through 12. They appear on the face of the judgment and will be gone over with the defendant by the probation office if and when he reports to begin his period of supervised release.

Then there are the special conditions. First, that he must obey the immigration laws and comply with the directives of the immigration authorities; and second, that the fine be paid in monthly installments of 10 percent of his gross monthly income beginning with the second month of supervised release; and thirdly, that the defendant, upon his release from prison, if not otherwise detained for deportation purposes, report to the nearest probation office to begin his period of supervised release, though I think, as I said, that that would be unlikely to happen.

Now, is there a restitution requirement here?

MR. RICHMAN: No, your Honor. We're not seeking. Thank you.

THE COURT: Very good. And a forfeiture requirement?

MR. RICHMAN: Same thing, your Honor. We're not seeking.

THE COURT: All right. Before I advise the defendant of his right of appeal -- and I will recommend Coleman as the place of detention, of imprisonment.

Before I advise the defendant of his right of appeal, anything else that either counsel wish to raise with the Court?

MR. RICHMAN: Your Honor, just one point, I think, of clarification. The Court at the outset, I believe, stated that it was assuming the safety valve applied. Is that correct, Judge?

THE COURT: I assume the safety valve applied, although, as I indicated, I thought it was academic.

MR. RICHMAN: Right.

THE COURT: I think if I had to make a determination, I would probably determine the safety valve did not apply.

MR. RICHMAN: OK.

THE COURT: But I thought, in fairness to the defendant, that it would be better to assume that and take that into account, which I did.

MR. RICHMAN: Thank you, your Honor.

My only, I guess, logistical point about that would be to the guidelines calculation, because if the safety valve applied, there would be a two-point deduction. I wanted to make clear --

THE COURT: That's a good point. That's a good point. Although the safety valve -- this would be a nonguideline sentence in any event, even with that adjustment. I look at the guidelines, but they are not particularly of interest to me.

MR. RICHMAN: I understand. And then otherwise the PSR has been adopted? I believe you said that. Thank you, Judge.

THE COURT: Very good. Anything from defense counsel?

MR. FEITEL: No, your Honor. Thank you.

THE COURT: Mr. Orellana, you have a right to appeal this sentence. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: If you can't afford counsel for any such appeal, the court will appoint one for you free of charge. Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Very good. Thanks a lot.

MR. RICHMAN: Your Honor, I just have, I'm sorry, one other thing. There's a judicial removal order that has been signed by the parties.

THE COURT: OK. If you want to hand that up.

MR. RICHMAN: Also, the government moves to dismiss -- there's one open count.

THE COURT: That is dismissed.

MR. RICHMAN: Thank you, your Honor.

THE COURT: All right. I've signed that. I'll give it to my courtroom deputy.

MR. RICHMAN: Thank you, your Honor.

THE COURT: Thanks a lot.

(Adjourned)