

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

August 19, 2024

**BY ECF AND ELECTRONIC MAIL**
The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Mario Amilcar Estrada Orellana*, 19 Cr. 328 (JSR)

Dear Judge Rakoff:

      The Government respectfully submits this opposition to defendant Mario Amilcar Estrada Orellana's motion for compassionate release. Prior to his arrest in 2019, the defendant was a leading candidate in the 2019 Guatemalan presidential election. During his campaign, he attempted to partner with Mexico's Sinaloa Cartel—one of the largest, most violent drug cartels in the world—by offering the cartel access to Guatemalan airports, ports, and Government positions in exchange for drug-money funding for his presidential campaign. In addition to his efforts to partner with the Sinaloa Cartel and other major drug traffickers, the defendant also participated in a campaign to assassinate certain of his political rivals and competition for the presidency. In short, as the Court summarized at sentencing, the defendant sought to "agree with a vicious drug cartel to allow them to bring very large quantities of this poison into the United States" and was "willing to sell his government, his people, his family, and the United States down the drain in order to get the funding to become president."

      The defendant now asks the Court for early release after completing approximately 35 percent of the 15-year sentence that the Court imposed in February 2020. As set forth below, the defendant, housed at FCI Ray Brook, has failed to exhaust his administrative remedies and has otherwise not shown that he is eligible for compassionate release. And, even if he had satisfied all statutory hurdles, Section 3553(a) weighs heavily against his release. For all of these reasons, his motion should be denied.

## BACKGROUND

    **A. The Offense Conduct**

      In late 2018, the defendant and his long-time friend and co-defendant, Juan Pablo Gonzalez Mayorga ("Gonzalez") began a series of meetings with a confidential source ("CS-1") acting at the direction of the DEA and purporting to have access to funding from the Sinaloa Cartel for the defendant's campaign (the "Estrada Campaign") for President of Guatemala. *See* December 26, 2019 Final Presentence Investigation Report ("PSR") ¶ 10. During their initial meetings, CS-1 explained that he had access to approximately $5 million and that, in exchange, his associates wanted promises that they could have access to certain positions in the Guatemalan government

and to the country as a transshipment point for cocaine. *Id.* Eventually, in approximately January 2019, CS-1 told the defendant and Gonzalez that the source of his funding was the Sinaloa Cartel, and that the Cartel was planning to move ton quantities of cocaine through Guatemala to the United States with the defendant's assistance. *Id.* At the time, the defendant was the candidate for the UCN, the political party he had founded and, according to certain polls, was a top-5 candidate in the 2019 election. PSR ¶ 11.

After initial meetings with CS-1, the defendant and Gonzalez developed their relationship with the Sinaloa Cartel and, eventually, met with a second confidential source acting at the direction of the DEA ("CS-2" and, collectively with CS-1, the "CSes") who purported to be a representative of the Sinaloa Cartel. PSR ¶ 13. During a meeting on February 7, 2019, Gonzalez detailed for the CSes his family's history in Guatemalan politics and explained that the defendant had a good chance to win if the Sinaloa Cartel funded the Estrada Campaign. *Id.* Gonzalez also discussed with the CSes whether they could kill certain political rivals, and explained that the campaign would pay the CSes to carry out the murders. PSR ¶ 14. Gonzalez instructed the CSes on how they should talk to the defendant; namely, he told them to be direct with Estrada, and explain in blunt terms the positions they wanted for the Sinaloa Cartel in exchange for their funding for the Estrada Campaign. PSR ¶ 15. Gonzalez explained that the CSes should tell Estrada that they wanted to control the Departments of the Interior and Defense and wanted control of the airports and the ports. *Id.*

The following day, the CSes met with the defendant and Gonzalez. PSR ¶ 16. During this meeting, CS-2 explained that he represented Ismael Mayo Zambada ("Zambada"), the then-leader of the Sinaloa Cartel, and that Zambada was interested in contributing to Estrada's campaign in exchange for Estrada supporting the Cartel's drug-trafficking activities in Guatemala. *Id.* The defendant explained why he needed the Cartel's support—to deliver money to each of the 22 districts in Guatemala so that he could gain voting support—and predicted that he could win the election if the Cartel provided him with 10 to 12 million dollars. PSR ¶ 17. CS-2 explained to the defendant that the money would come from cocaine sales in New York, and that, in exchange, CS-2 would require Estrada to help the Cartel transport cocaine through the airports in Guatemala. PSR ¶ 18. More specifically, CS-2 detailed that the Cartel would send approximately six cocaine-laden airplanes per month through the country, each of which would carry multiple tons of cocaine, and that CS-2 would pay the defendant the value of approximately 10 percent of the cocaine on each plane. PSR ¶ 19. The defendant agreed to assist the Cartel in exchange for the campaign financing. PSR ¶¶ 19-20. The parties then discussed assassinating political rivals to benefit the Estrada campaign. PSR ¶ 21. Finally, CS-2 explained that, by the following week, CS-2's clients in New York were expected to start paying the Cartel for the cocaine and, as a result, CS-2 anticipated having $5 million ready for the Estrada Campaign in the near future. PSR ¶ 22.

After a series of subsequent phone calls, Gonzalez met with CS-2 and an undercover officer ("UC-1") at an undercover DEA warehouse (the "Warehouse") in Miami, Florida. PSR ¶ 23. During this meeting, CS-2 introduced UC-1 to Gonzalez as a hitman who was available for hire to carry out the assassinations. *Id.* Gonzalez discussed with CS-2 and UC-1 the targets of their potential assassination plot, and specified that he and the defendant could have firearms ready for them to use to carry out their plans. PSR ¶ 24. CS-2 and UC-1 then showed Gonzalez a vehicle located inside the Warehouse that contained packages of fake U.S. currency inside a hidden compartment in the vehicle trunk. PSR ¶ 25. After Gonzalez saw the money, he placed a video call to the defendant to show him the Warehouse and the currency. PSR ¶ 26.

The same day as Gonzalez's tour of the Warehouse and conversation with UC-1, the defendant met with CS-1 in Guatemala City. PSR ¶ 27. During this meeting, the defendant expressed his frustration at Gonzalez for calling him from the Warehouse and concern about potential criminal exposure. *Id*. Despite this purported concern, the defendant continued to press forward with his plans with the Sinaloa Cartel. Four days later, on February 18, the defendant had another meeting with CS-1 during which the defendant said he had arranged with associates who were able to receive money from CS-1 and move it to Guatemala for the defendant. *Id*. ¶ 28. CS-1 responded that the money the Sinaloa Cartel was going to pay the defendant was originally going to come from a drug sale in New York but, once Gonzalez traveled to Miami, they decided to use proceeds from drug sales in Miami, instead. *Id*.

Less than two weeks later, the defendant himself traveled to Miami, Florida, where he met with both CS-1 and CS-2 on an undercover DEA yacht (the "UC Yacht"). PSR ¶ 30. The UC Yacht, wired for both audio and video recording, captured the defendant in the throes of his negotiations with the CSes and accepting a $10,000 cash advance:



First, during the meeting, the defendant explained that he expected to win the election and wanted to be clear with his future partners about their plans. *Id*. CS-2 then told the defendant that the Sinaloa Cartel had recently received 30 tons of cocaine in New York, and that sales from this cocaine would now funnel to the payments to the defendant. PSR ¶ 31. CS-2 said they already had the previously discussed $5 million in Miami for the defendant, and the defendant explained that he had a money laundering contact ("CC-1") who could help them move that cash to Guatemala. *Id*.

Estrada then detailed how he planned to help the Sinaloa Cartel once he was elected. CS-2 explained that the Sinaloa Cartel wanted to send up to approximately six cocaine-laden planes per month to Guatemala, and the defendant would receive 10 percent of the profits from sale of the massive quantity of cocaine these planes transported. PSR ¶ 32. CS-2 further explained that this cocaine would be destined for New York once it passed through Guatemala and Mexico. *Id*. The defendant eagerly replied that he was "convince[d] that I'm going to win [the election]" and promised to support the cartel's drug-trafficking activities once he won. PSR ¶ 33. In particular, the defendant promised to accept the Sinaloa Cartel's cocaine-laden planes at airports and ports in Guatemala, and to appoint Cartel members to key government positions. *Id*. The defendant then asked CS-2 to bring him one or two million dollars more quickly because he needed to invest it in his campaign. PSR ¶ 34. CS-2 then provided the defendant with an advance of $10,000, and noted

that he did not want to give him more at the time because it could draw scrutiny from law enforcement (the red circle below is around the $10,000):



During this meeting, the defendant also called off the assassination plans. PSR ¶ 35. He did so not because the defendant had any qualms about moving forward or moral equivocation, but merely because the defendant knew that his rival was going to be "denied" participation in the elections and thus didn't need to be murdered (and, as the defendant predicted, an arrest warrant was issued for this rival when she was living in El Salvador). About three weeks later, the defendant again met with CS-1 at his office in Guatemala, and, this time, the defendant also invited CC-1 to join them. PSR ¶ 36. At this meeting, the defendant emphasized that he needed the funds quickly, and the three discussed how they could get the money to Guatemala. *Id.* The defendant himself suggested that they use the UC Yacht to transport the money, and the defendant took out a map to show how the UC Yacht could travel from Miami, through Cuba, to Guatemala. *Id.*

CC-1, experienced in money laundering, explained to the defendant concerns about whether the UC Yacht would be detected by law enforcement, and the defendant responded that any risks were mitigated by the fact that the UC Yacht was a luxury yacht, flying the American flag, and sailed by Americans. PSR ¶ 37. These meetings continued the following day, when CS-1 explained to the defendant and CC-1 that he had found someone who could move their money for a 12 percent commission. PSR ¶ 39. The defendant responded that CC-1 had also found someone to help move the money from Miami, and instructed CC-1 to finalize those negotiations for the first $2 million they were expecting. *Id.* While the defendant pressured the CSes for his money, he told them of other traffickers who had promised to support him. More specifically, the defendant said he was also working with a trafficker based in Guatemala who was supporting his bid for the presidency. PSR ¶ 42. He also told CS-1 that he had heard that the Jalisco Nuevo Generación Cartel wanted to support his campaign in exchange for similar access. *Id.*

Finally, after a series of additional meetings and telephone calls, the defendant traveled to Miami on April 17, 2019, ostensibly to meet with CS-1 and CS-2 to finalize their agreement. Instead, the defendant was arrested. PSR ¶ 47. After he was arrested, he waived his *Miranda* rights and participated in a voluntary interview with law enforcement. *Id.* During the course of his post-arrest interview, the defendant admitted that (i) he came to Miami to meet with CS-2 to discuss campaign financing, and had met with CS-2 on two previous occasions; (ii) he was planning to accept $5 million towards his campaign from CS-2; (iii) Gonzalez and CS-1 introduced him to CS-2; (iv) he thought CS-2 may have been involved in bad things, like narcotics trafficking, and that he had once been asked by CS-1 and CS-2 about participating in the drug trade but declined; (v) CS-2 asked for control over specific positions in the Government, but that the defendant had told him that he could not appoint individuals who would support drug trafficking;

and (vi) the requested money was probably coming from the Sinaloa Cartel, but he was not himself responsible for the source of the funds. *Id.*

### B. Procedural History

After the defendant's arrest, his initial appearance took place in the Southern District of Florida where he was ordered detained and transferred to the Southern District of New York, where he arrived on or about May 21, 2019. *See* Dkt. 7. On June 25, 2019, the defendant filed a motion for pretrial release. *See* Dkt. 18. After oral argument on July 17, 2019, the Court denied the defendant's request, finding that the defendant posed a flight risk. *See* July 17, 2019 Tr., Dkt. 21, at 29-32. In addition, the Court noted that it was "troubled by the tapes" of the defendant's conversations regarding the assassination of his rivals, and the Court determined that it was likely that the defendant agreed to assassinate a political rival and two associates. *Id.* at 29-30.

On October 8, 2019, the defendant pled guilty pursuant to a plea agreement (the "Plea Agreement"). PSR ¶ 6. In the Plea Agreement, the defendant stipulated that the offense conduct involved more than 450 kilograms of cocaine—the highest level available under the Guidelines. *See id.* The defendant further stipulated that he "used violence, made a credible threat to use violence, or directed the use of violence," resulting in a two-level enhancement. *Id.* Ultimately, the Plea Agreement calculated a Stipulated Guidelines Range of 210 to 262 months' imprisonment, with a mandatory minimum term of 60 months' imprisonment. *Id.* Consistent with the Plea Agreement, the Probation Office calculated a total offense level of 37, criminal history category of I, and Guidelines range of 210 to 262 months' imprisonment. PSR ¶¶ 53-63, 66, 101.

The Court sentenced the defendant on February 11, 2020. The Court adopted the total offense level of 37, criminal history category of I, and found the Guidelines range to be 210 to 262 months' imprisonment. Dkt. 40 at 2. The Court then elaborated that it did not think the defendant was eligible for the safety valve, but assumed for the purposes of sentencing that he was. *Id.* at 2-3. The Court then noted that the defendant's conduct was "despicable" and that the defendant want to distribute "very large quantities of this poison" into the United States. *Id.* at 5. In sum, the Court noted the "many laudable things that could be said about this defendant" including that he overcame "abject poverty" to become a good citizen, but then focused on the "shock[ing]" conduct of the defendant who chose "to betray everyone who had trust in him and his very country." *Id.* at 15-16. In closing, the Government asked the Court to clarify whether the safety valve applied, and the Court reiterated that it "assume[d] the safety valve applied" but found it "academic" and determined that "if I had to make a determination, I would probably determine the safety valve did not apply." *Id.* at 18. Finally, the Court concluded that the sentence imposed would be a nonguidelines sentence even with the adjustment for the safety valve, and that while the Court "look[ed] at the Guidelines," they were "not particularly of interest." *Id.* at 19.

The defendant filed an appeal of his sentence on October 24, 2021. His sole argument on appeal was that the Court had failed to state its reasons for imposing sentence as required by Title 18, United States Code, Section 3553(c). The Government moved to dismiss the appeal as barred by the appellate waiver in the Plea Agreement, and the Court of Appeals agreed, ordered the motion granted, and dismissed the appeal. Dkt. 51.

### C. The Motion for Compassionate Release

The defendant filed his motion for compassionate release on July 30, 2024. (Dkt. 53). The defendant raises several bases for his requested relief. First, he seeks a sentence reduction through the retroactive application of Guidelines Amendment 821, which took effect on November 1, 2023. Next, he argues that he is deserving of compassionate release owing to (a) his age and medical conditions, which he argues make him more susceptible to COVID-19; (b) his mother's age and medical conditions; and (c) his purported rehabilitation while incarcerated.

## LEGAL STANDARD

A court may grant a motion for compassionate release only if the defendant has demonstrated that (i) he has exhausted his administrative remedies, (ii) there are "extraordinary and compelling reasons" for a reduction of the sentence, (iii) the Section 3553(a) factors favor such a reduction, and (iv) such a reduction is consistent with the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). "[T]o grant a motion for compassionate release, a court must . . . in addition to finding that the other elements of the compassionate release standard are satisfied, also find that granting such relief 'is consistent with' Policy Statement 1B1.13 [of the U.S. Sentencing Guidelines (the "Guidelines")], which sets forth the circumstances under which an extraordinary and compelling reason for compassionate release or sentence reduction would exist." *United States v. Feliz*, No. 16 Cr. 809 (VM), 2023 WL 8275897, at *4 (S.D.N.Y. Nov. 30, 2023) (quoting 18 U.S.C. § 3582(c)(1)(A)) (internal citation omitted). In addition to presenting "extraordinary and compelling" reasons warranting a sentence reduction, the court must also find that the defendant is not a danger to the safety of any person or to the community. U.S.S.G. § 1B1.13(a).

The defendant, as the proponent of the motion, bears the burden of proving that he is entitled to the requested relief. *See United States v. Ebbers*, 432 F. Supp. 3d 421, 426 (S.D.N.Y. 2020) ("The defendant has the burden to show he is entitled to a sentence reduction.").

## ARGUMENT

Section 3582 "requires the Court to ask four questions: (1) has the defendant complied with the administrative exhaustion requirement, (2) has the defendant shown extraordinary and compelling reasons warranting a sentence reduction, (3) are the 18 U.S.C. § 3553(a) sentencing factors consistent with a lesser sentence than that previously imposed, and (4) is there a particular sentence reduction consistent with the § 3553(a) factors that is also warranted by extraordinary and compelling reasons." *United States v. Salemo*, No. 11 Cr. 65 (JSR), 2021 WL 4060354, at *2 (S.D.N.Y. Sept. 7, 2021) (quoting *United States v. Garcia*, 505 F. Supp. 3d 328 (S.D.N.Y. 2020)) (internal quotation marks omitted).

### A. The defendant failed to exhaust his administrative remedies.

Section 3582(c)(1)(A) mandates that a defendant may seek compassionate release only after "[he] has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." Thus, the defendant must first fully exhaust all administrative rights or wait 30 days after transmitting his request to the warden. *Salemo*, 2021 WL 4060354, at *2. While the defendant attaches to his motion a purported

letter to the warden of his facility, the Bureau of Prisons has informed the Government that it has no record of any compassionate release request from the defendant. Thus, the defendant has not exhausted his administrative remedies, and the Court should deny the motion for compassionate release on this basis, standing alone.[1]

### B. The defendant does not qualify under Amendment 821

The defendant's first argument would rest on Part B, Subpart 1, of Amendment 821, which provides a two-level downward adjustment in offense level if, as a result of Amendment 821, the defendant's amended Guidelines range is lower than the range that applied at the defendant's original sentencing, *and if* the defendant did not already receive a sentence lower than the amended range on any ground other than substantial assistance. Section 3582(c)(2), which governs the defendant's motion, "establishes a two-step inquiry. A court must first determine that a reduction is consistent with Section 1B1.10 before it may consider whether the authorized reduction is warranted, either in whole or in part, according to the factors set forth in § 3553(a)." *Dillon v. United States*, 560 U.S. 817, 826 (2010). Under application note 1(A) to Section 1B1.10: "Eligibility for consideration under 18 U.S.C. § 3582(c)(2) is triggered only by an amendment listed in subsection (d) that lowers the applicable guideline range (*i.e.*, the guideline range that corresponds to the offense level and criminal history category determined pursuant to §1B1.1(a), which is determined before consideration of any departure provision in the Guidelines Manual or any variance)." Among the many dispositive criteria are:

> <u>4C1.1(a)(3).</u> The defendant did not use violence or credible threats of violence in connection with the offense.
>
> <u>4C1.1(a)(7).</u> The defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense.

Here, the defendant does not qualify for relief and, even if he did, the Court should nevertheless deny the motion pursuant to the facts set forth in 18 U.S.C. § 3553(a), as further detailed below).[2] The defendant fails to qualify because his offense involved "violence or credible

---

[1] This Court has held that the exhaustion requirement can be judicially waived in the interest of efficiency. *See United States v. Haney*, 454 F. Supp. 3d 316, 322 (S.D.N.Y. 2020) (Rakoff, J.) (noting that strict enforcement of the exhaustion requirement would "force[] [courts] to consider each such motion twice, first to conclude that the exhaustion provision is not satisfied, and then again, days or at most a few weeks later, to reach the merits once the requisite time has elapsed"). Should the Court agree to waive the exhaustion requirement, the Motion should be denied on the merits for the reasons discussed below. *See id.* at 322 & 324 (waiving exhaustion requirement and denying motion for compassionate release).

[2] Courts throughout this district have denied sentence reductions under Amendment 821 when the Section 3553(a) factors still supported the original sentence imposed. *See, e.g.*, *United States v. Calk*, No. 19 Cr. 366 (LGS), Dkt. No. 318, at *2-3 (S.D.N.Y. Mar. 4, 2024) ("For the reasons expressed at Defendant's initial sentencing hearing, the previously imposed sentence is the minimum sentence necessary" to meet 18 U.S.C. § 3553(a)(2)(A)-(B))*; United States v. Crute*, No. 19 Cr. 816 (VB), Dkt. No. 78, at *2 (S.D.N.Y. Feb. 20, 2024) ("To reduce Crute's term of

threats of violence" and because the offense involved the possession of firearms, both disqualifying factors under Section 4C1.1(a). Indeed, the defendant stipulated in connection with his plea that an enhancement under the Guidelines applied for just this reason—because he "used violence, made a credible threat to use violence, or directed the use of violence." PSR ¶ 6. And this was clearly borne out by the facts of this case. The defendant actively engaged in a plot to kill his political rivals, and threatened violence against them in connection with this plot. Further, his co-conspirator told the CSes that AK-47s were available if needed in Guatemala, and that *the defendant* could provide the firearms they needed to carry this out. PSR ¶ 24. More specifically, his co-conspirator explicitly told the CSes that they could provide "lots of AK-47s" to carry out the assassination and, when UC-1 responded that they specifically needed "3 AK-47s and 2 pistols" to carry out the task, Gonzalez replied that "Mario [the defendant] will have everything ready for you." *Id.* Standing alone, this provides a basis to deny any adjustment under Amendment 821. Coupling these statements with the defendant's credible threats of violence to his rivals makes even more plain that the defendant does not qualify for relief.

Finally, the Court need not reach this inquiry because, in any event, Section 3553(a) supports denial of the motion, as detailed below.

---

imprisonment now, simply because his criminal history category no longer takes into account the fact that he was on supervised release at the time of the offense, would surely promote disrespect for the law and would also disrespect the views of Crute's victims. This is not a step the Court is willing to take."); *United States v. Khaziran*, No. 21 Cr. 603 (VEC), Dkt. No. 1247, at 3 (S.D.N.Y. Jan. 17, 2024) ("Defendant urges the Court to reduce his sentence by six months primarily because he has been a 'model inmate,' promptly took responsibility for his actions, has strong family connections, and is unlikely to reoffend. The Court commends Defendant for his good behavior and employment while incarcerated. Those factors are not enough, however, to justify a reduction of sentence in this case." (citations omitted)). Many courts have likewise denied sentence reductions when previous Guideline amendments lowered the applicable sentencing ranges. *See, e.g.*, *United States v. Wilson*, 716 F.3d 50, 53 (2d Cir. 2013) (denial of sentence reduction was not an abuse of discretion, although earlier sentence reduction had been granted despite defendant's prison misconduct, and defendant had not engaged in any new prison misconduct); *United States v. Styer*, 573 F.3d 151, 154-55 (3d Cir. 2009) (denial based on nature of original criminal conduct); *United States v. Stevenson*, 332 F. App'x 261, 262-63 (6th Cir. 2009) (reduction denied despite eligibility under amendment, based on disciplinary infractions in prison, and lengthy criminal record); *United States v. Dunn,* 728 F.3d 1151, 1160 (9th Cir. 2013) (reduction denied where, among other things, "the original sentence was needed to afford adequate deterrence" (internal quotation marks omitted)); *United States v. Arceneaux*, 297 F. App'x 819, 821 (10th Cir. 2008) (reduction denied due to disciplinary record in prison); *United States v. Suell*, No. 99 Cr. 324, 2008 WL 2845295, at *3 (N.D. Tex. July 17, 2008) (motion denied because defendant benefitted from a favorable plea agreement in which charges were dismissed and the sentence was reduced); *United States v. Reynolds*, No. 95 Cr. 71, 2008 WL 2367254, at *3 (S.D. W. Va. June 9, 2008) (motion denied because defendant's criminal conduct was "nothing short of egregious"), *aff'd*, 309 F. App'x 703 (4th Cir. 2009); *United States v. Melton*, No. 98 Cr. 50, 2008 WL 1787045, at *2 (W.D.N.C. Apr. 17, 2008) (denial based on nature of offense); *United States v. Craig*, No. 96 Cr. 105, 2008 WL 1775263, at *2 (W.D.N.C. Apr. 15, 2008) (denial based on the facts of the case).

### C. The defendant has not shown extraordinary and compelling reasons justifying early release.

The defendant has not met his burden to show that his circumstances—his age of 64, his health issues, his need to care for his 82-year old mother, and his rehabilitation—amount to "extraordinary and compelling" reasons warranting compassionate release.

The defendant cites to his hypertension and "other medical problems" and argues that, coupled with his age, he is more susceptible to COVID-19. (Def. Mot. at 16-17). The defendant is not: "suffering from a terminal illness." U.S.S.G. § 1B1.13(b)(1)(A). Nor is he "suffering from a serious physical or medical condition," "a serious functional or cognitive impairment," or "experiencing a serious deterioration in physical or mental health because of the aging process" that "substantially diminish" his ability to "provide self-care" while detained and "from which he is not expected to recover." *Id.* § 1B1.13(b)(1)(B). Nor is he "suffering from a medical condition that requires long-term specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death. *Id.* § 1B1.13(b)(1)(C). The defendant is not "at least 65 years old," "experiencing a serious deterioration" in health because of the aging process, and he has not "served at least 10 years or 75 percent of his term of imprisonment." *Id.* § 1B1.13(b)(2). And he has not identified any other circumstances that "are similar in gravity" to the above. *Id.* § 1B1.13(b)(5). Indeed, the defendant's medical records reveal that he has repeatedly been checked for hypertension (among other ailments) while in BOP custody, denied having hypertension, and that, when the defendant has indicated a medical concern, it has been promptly addressed. *See Ex. A* at 9, 21, 71, 95 (noting that hypertension was "denied"); Ex. A generally (outlining the defendant's medical care and treatment).[3]

Nor is the defendant's age and weight in combination with his other more minor ailments a cause for sentence reduction. Courts in this district have denied motions by defendants older than the defendant who have suffered from multiple conditions or required multiple surgeries more serious than the defendant's. *See, e.g.*, *United States v. Castillo*, No. 03 Cr. 979 (KMW), 2023 WL 2262881, at *2 (S.D.N.Y. Feb. 28, 2023) (denying release for 65-year-old defendant with "serious age-related medical conditions including an enlarged prostate, eye problems, and heart disease" because those conditions were "well-managed" by the BOP); *United States v. Saleh*, No. 93 Cr. 181 (LAP), 2023 WL 158444, at *5 (S.D.N.Y. Jan. 10, 2023) (holding that 65-year-old defendant requiring multiple surgeries is "not 'experiencing a serious deterioration in physical or mental health because of the aging process'" but "[r]ather, he is experiencing the usual aches and pains of a 65-year-old"); *United States v. Borelli*, No. 84 Cr. 63 (LAP), 2021 WL 2228075, at *2 (S.D.N.Y. June 2, 2021) (finding no extraordinary and compelling circumstances for 72-year-old defendant suffering from diabetes, hypertension and heart disease, and cataracts), *aff'd*, No. 21-1506, 2022 WL 6831650 (2d Cir. Oct. 12, 2022); *United States v. Sabir*, 481 F. Supp. 3d 270, 275 (S.D.N.Y. 2020) (holding that 66-year-old defendant with prostate cancer, asthma, and prediabetes had not established "extraordinary and compelling circumstances"); *United States v. Gotti*, 433 F. Supp. 3d 613, 617 (S.D.N.Y. 2020) (denying release where 79-year-old defendant's hypothyroidism, hyperlipidemia, gout, glaucoma, left eye blindness, hypertension, ischemic cardiomyopathy, heart failure, chronic obstructive pulmonary disease, esophageal reflux, and

---

[3] The Government attaches a copy of the defendant's medical records under seal for the Court's review and takes no position on whether they should be publicly filed in this case.

chronic atrial fibrillation could be "adequately treated and monitored" by BOP); *Cf. United States v. Haney*, 454 F.Supp.3d 316, 323 (S.D.N.Y. 2020) ("But if Haney's age alone were a sufficient factor to grant compassionate release in these circumstances, it follows that every federal inmate in the country above the age of 60 should be forthwith released from detention, a result that does not remotely comply with the limited scope of compassionate release and that would arguably have a devastating effect on a national community that is now itself so under stress."). Simply put, neither the defendant's age nor weight are so outside the norm so as to merit a sentence reduction, especially considering his heinous offense conduct.

The defendant's effort to cloak his age and medical concerns in the COVID-19 pandemic fares no better. To be sure, the Sentencing Guidelines anticipate that a public health emergency could be extraordinary and compelling *See* U.S.S.G. § 1B1.13(b)(D). The defendant must show that the facility is at "imminent risk" of being affected by "an outbreak of infectious disease" or an "ongoing public health emergency"; that the defendant is at an "increased risk of suffering severe medical complications or death" due to "personal health factors and custodial status"; and that "such risk cannot be adequately mitigated in a timely manner." *Id.* This test is consistent with the position previously articulated by courts within this district that "the risks posed by the pandemic alone do not constitute extraordinary and compelling reasons for release, absent additional factors such as advanced age or serious underlying health conditions that place a defendant at greater risk of negative complications from the disease." *See, e.g.*, *United States v. Kitroser*, 15 Cr. 19 (KPF), 2023 WL 3173513, at *5 (S.D.N.Y. May 1, 2023).

Here, the risk of COVID-19 is not an extraordinary and compelling reason for early release because the defendant has not demonstrated either an outbreak at FCI Ray Brook or personal factors that place him at greater risk of severe illness from the disease. Data from the BOP shows that, as of August 13, 2024, the majority of inmates at FCI Ray Brook were fully vaccinated and there were zero active cases at the facility. *See* Inmate COVID-19 Data, *available at* https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp#lastestCovidData.

The defendant next argues that his mother's age and medical conditions constitute extraordinary and compelling reasons justifying his release. (Def. Mot. at 17-18). For a family circumstance regarding the health of a parent to potentially qualify as an extraordinary and compelling reason for early release requires "[t]he incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent." U.S.S.G. § 1B1.13(b)(3)(C). Beyond the defendant's barebone assertions that he is the only available caretaker for his mother, the defendant has provided no evidence that (a) his mother is now incapacitated or (b) that he is the only available caretaker. Indeed, the medical records the defendant provides are from 2021—over three years ago—undermining any argument that the defendant's care is *necessary* for his mother. And, as reflected in the PSR and as the Court referenced at sentencing, the defendant comes from a large family. As of 2019, when the PSR was written, the defendant reported that his mother was "a homemaker" in Guatemala, and that he was one of six siblings, with five still living in Guatemala. PSR ¶¶ 71, 72. The defendant reported to the Probation Office that all of his siblings are employed or retired, and that he has a "good relationship" with all of them. *Id.* Further, the defendant reported having five children—four of whom are now adults—and all of whom live in Guatemala. PSR ¶¶ 75-77. Thus, the defendant (and his mother) appear to have a strong support network and family in Guatemala and, thus, the defendant is not the "only available caregiver."

Setting aside the defendant's medical complaints and complaints concerning his mother's medical conditions and age—which are far from extraordinary and compelling—the defendant also contends that his participation in certain BOP programs, including "divers[ion] programs and classes" and "other programs" constitute extraordinary and compelling reasons. (Def. Mot. at 18-19). For starters, as this Court has noted on several occasions, "the statutory language expressly provides that 'rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.'" *United States v. Halliburton*, No. 20 Cr. 499 (JSR), 2024 WL 3014179 at *1 (S.D.N.Y. Jun. 13, 2024); *see also United States v. Glynn*, No. 06 Cr. 580 (JSR), 2022 WL 562652 at *6 (S.D.N.Y. Feb. 24, 2022) ("The Court is not considering rehabilitation alone, but instead rehabilitation along with the other circumstances, discussed above, that together constitute extraordinary and compelling reasons for reducing Glynn's sentence."). Even so, defendant's efforts at rehabilitation do not move the needle. "To find otherwise would convert the process for obtaining compassionate release into a de facto parole system, through which defendants with good behavior are rewarded with sentence reductions." *United States v. Salgado*, 15 Cr. 681 (VEC), 2022 WL 3043100, at *2 (S.D.N.Y. Aug. 2, 2022)." This does not provide a basis, alone or in conjunction with the defendant's additional arguments, to shorten his sentence.

### D. The Section 3553(a) factors weigh heavily against release

"A court may still deny compassionate release where the § 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances." *United States v. Orlandez-Gamboa*, No. 99 Cr. 654 (CM), 2021 WL 2582077, at *3 (S.D.N.Y. June 23, 2021), *aff'd*, 2022 WL 17491645 (2d Cir. Dec. 8, 2022). The seriousness of the defendant's conduct, the need to protect the public, and the need for deterrence all weigh against any sentencing reduction, even if the defendant had met the requirements of Section 3582, which he has not.

First, the nature and circumstances of the offense remain extremely serious. As the Court summarized in sentencing the defendant just four years ago, the defendant sought to "agree with a vicious drug cartel to allow them to bring very large quantities of this poison into the United States" and was "willing to sell his government, his people, his family, and the United States down the drain in order to get the funding to become president." The defendant sought to help the Sinaloa Cartel move *tons* of cocaine to the United States, and to use the Cartel's hitmen to carry out murders on his behalf. The conduct could hardly be more worthy of punishment; the defendant sought the highest office in his country and promised to sell out that office, and his countrymen, to the benefit of the Sinaloa Cartel and the detriment of his country, this country, and countless communities in between. Without individuals like the defendant—willing to corrupt their office and countries to aid large-scale cocaine traffickers—the transport of cocaine from South America to this country would grow more difficult and the resulting harms to this country would diminish. As the Court recognized in sentencing the defendant, this conduct merits a very serious sentence reflecting the nature of the crime. Standing alone, the nature and circumstances of the crime merit a denial of the defendant's motion for release at this juncture, less than 40 percent into the sentence imposed just four years ago.

Second, the defendant's conduct is of the type that he could possibly resume upon release (or assist others in committing) and, particularly given the defendant's inability to accept full responsibility for his crimes, and likely continued ties to the political establishment in Guatemala, the Court should harbor a deep concern about recidivism. Despite purporting to accept responsibility for his offense, the defendant, in his motion for compassionate release, claims that

the CSes "took advantage of [the defendant's] deeply held desire to be elected President for the betterment of Guatemala, to lure him into a fictional drug deal." (Def. Mot. at 5). This statement is deeply troubling. The defendant was far from "lured" into this investigation; instead, he jumped at the opportunity to partner with the Sinaloa Cartel in exchange for drug money and went even further in seeking the Cartel's assistance in murdering his political rivals. Indeed, the defendant boasted to the CSes that a second cartel (the Jalisco Nuevo Generación Cartel) had also wanted to support his campaign in exchange for similar access. PSR ¶ 42. Thus, despite the public prosecution in this case, the defendant has shown that he has ties to cartels, and to politicians, and there is significant concern he could resume this conduct if released now.

And third, both general and specific deterrence strongly weigh against any sentence reduction. *See United States v. Cooper*, No. 16 Cr. 567 (JSR), 2020 WL 4937477 at *2 (S.D.N.Y. Aug. 24, 2020) ("The 3553(a) factors weigh against compassionate release. First, granting Cooper's motion after he has served less than 40% of the 100-month prison sentence the Court imposed would fail 'to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.'"); *United States v. France*, No. 17 Cr. 724 (JSR), 2020 WL 3415241 at *2 (S.D.N.Y Jun. 19, 2020) ("A further reduction in France's sentence, which was already below the applicable Guidelines range, would not reflect the seriousness of his crimes, provide just punishment, promote respect for the law, and afford specific and general deterrence."). Sadly, corruption and cocaine trafficking continue to wreck havoc in South America, Central America, and the United States. There is a continued need to send a strong message to those like the defendant who would sell out their countries and offices in support of violent drug trafficking; granting the defendant's motion, and cutting his sentence short after he has served less than 40 percent of that imposed, would send the exact opposite signal.

Accordingly, the Section 3553 factors weigh heavily against a sentence reduction.

## CONCLUSION

The defendant is neither eligible for, nor deserving of, early release.  His motion should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:  /s/
    Jason A. Richman
    Kyle Wirshba
    Assistant United States Attorneys
    (212) 637-2589

cc:    Mario Estrada Orellana, 18096-104
       FCI Ray Brook
       Federal Correctional Institution
       P.O. Box 900
       Ray Brook, NY 12977
       (by first-class mail, with attachment)